# EXHIBIT A

V. James DeSimone (SBN: 119668)
vjdesimone@gmail.com
Ryann E. Hall (Of-Counsel)(SBN: 306080)
rhall@bohmlaaw.com; VJD000103@bohmlaw.com
**V. JAMES DESIMONE LAW**
13160 Mindanao Way, Suite 280
Marina del Rey, California 90292
Telephone:  310.693.5561
Facsimile:   323.544.6880

Anne Della Donna (SBN:138420)
annee@delladonnalaw.com
**LAW OFFICE OF ANNEE DELLA DONNA**
301 Forest Ave
Laguna Beach, California 92651

Attorneys for Plaintiffs, JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest,<br><br>PLAINTIFFS,<br><br>v.<br><br>ARTURO PACHECO, ASHLEY MARIE AURICH, JEFFREY BIGNEY, ARTURO LUNA, DORIAN LOPEZ, BRENDA VILLA, DAVID BAUGHMAN, JEFFREY LYNCH and DOES 1 through 15, inclusive, in their official and personal/individual capacities.<br><br>DEFENDANTS. | Case No: 2:22-cv-1610 DAD-DMC (PC)<br>Assigned to Hon. Dennis M. Cota<br><br>**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**<br><br>1. Violation of Civil Rights 42 U.S.C. Section 1983— Eighth Amendment—Convicted Prisoner's Claim of Excessive Force<br>2. Violation of California Civil Code Section 52.1 (Bane Act)<br>3. Supervisory Liability for Violation of Civil Rights 42 U.S.C. Section 1983<br>4. Wrongful Death<br>5. Violation of Civil Rights 42 U.S.C. Section 1983— Eighth Amendment—Convicted Prisoner's Claim of Failure to Protect<br>6. Concealment<br>7. Intentional Misrepresentation<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs JoAnn Price, and the Estate of Ronnie Price upon information and belief, allege the following:

1

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                                V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

## <u>INTRODUCTION</u>

1. This civil rights action seeks compensatory and punitive damages from defendants for brutally assaulting Mr. Price and causing him catastrophic injuries resulting in his death and additionally conspiring to falsify and cover up his assault, injuries and death. Mr. Price was assaulted while handcuffed and without justification while incarcerated at CSP Sacramento, located at 100 Prison Road, Represa, California (hereinafter "CSP Sac").

2. On or about September 15, 2016, Mr. Price was assaulted by the California Department of Corrections and Rehabilitation [hereinafter CDCR] guard Arturo Pacheco and taken to University of California Davis Medical Center [hereinafter UC Davis Medical Center] for treatment where he died two days later as a result of the injuries suffered in the assault. Unbeknownst to the Price family, multiple prison guards falsified reports and conspired to cover up the assault and other felonious conduct toward Mr. Price.

## <u>JURISDICTION AND VENUE</u>

3. This is an action for money damages brought pursuant to Title 42 of the United States Code, Sections 1983 and 1988; and the Eighth and Fourteenth Amendments of the United States Constitution against various correctional employees then working at CSP Sac.

4. Jurisdiction is conferred upon this Court by Title 42 of the United States Code, Sections 1331 (federal question) and 1343(a) (civil rights). Jurisdiction is conferred for the remaining claims by Title 28, United States Code Section 1367(a) because they form part of the same case or controversy.

5. Venue lies in the Eastern District of California pursuant to Title 28, United States Code Section 1391(b), as the unlawful acts and practices alleged herein occurred in and around the City of Represa, County of Sacramento, California, which is within this judicial district.

## <u>PARTIES</u>

6. Plaintiff JoAnn Price is the sister of Mr. Price. JoAnn Price is, and was at all times mentioned herein, an individual and citizen of the United States of America, resident of Los Angeles County.

7. At all relevant times and specifically in and around September 2016, defendant

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*      V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

Arturo Pacheco was an employee of CDCR. Defendant Pacheco was acting under color of state law when he assaulted Mr. Price and later conspired to falsify and cover up his misconduct in causing the death of Mr. Price. Defendant Pacheco is sued in both his professional and individual/personal capacities for his own culpable actions.

8.     At all relevant times and specifically in and around September 2016, defendant Jeffrey Bigney was an employee of CDCR. Defendant Bigney was acting under color of state law when he conspired to falsify and cover up the misconduct of other CDCR employees in assaulting and causing the death of Mr. Price. Defendant Bigney is sued in both his professional and individual/personal capacities for his own culpable actions.

9.     At all relevant times and specifically in and around September 2016, defendant Arturo Luna was an employee of CDCR. Defendant Luna was acting under color of state law when he conspired to falsify and cover up the misconduct of other CDCR employees in assaulting and causing the death of Mr. Price. Defendant Luna is sued in both his professional and individual/personal capacities for his own culpable actions.

10.     At all relevant times and specifically in and around September 2016, defendant Dorian Lopez was an employee of CDCR. Defendant Lopez was acting under color of state law when he conspired to falsify and cover up the misconduct of other CDCR employees in assaulting and causing the death of Mr. Price. Defendant Lopez is sued in both his professional and individual/personal capacities for his own culpable actions.

11.     At all relevant times and specifically in and around September 2016, defendant Brenda Villa was an employee of CDCR. Defendant Villa was acting under color of state law when she conspired to falsify and cover up the misconduct of other CDCR employees in assaulting and causing the death of Mr. Price. Defendant Villa was a Sergeant within CDCR and was the direct supervisor of several of the defendants in this case. Defendant Villa is sued in both her professional and individual/personal capacities for her own culpable actions.

12.     Defendant Jeffrey Lynch was, at all times mentioned, employed by CDCR, as Warden and/or Assistant Warden of CSP Sac, which is a state-run prison under CDCR. Defendant Lynch was at all times mentioned responsible for the oversight, maintenance and policy making

3

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

decisions of CSP Sac. He was at all relevant times herein responsible for setting and enforcing the policies, customs and practices of CSP Sac. In addition, defendant Lynch was responsible for the supervision, training and hiring of persons and employees working within CSP Sac including correctional officers and other employees within CSP Sac. Defendant Lynch is sued in both his professional and individual/personal capacities for his own culpable action or inaction in the training, supervision or control of his subordinates, or for his acquiescence in the constitutional deprivations which this complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others.

13. Defendant David Baughman was, at all times mentioned, employed by CDCR, as Warden or Acting Warden of CSP Sac, which is a state-run prison under CDCR. Defendant Baughman was at all times mentioned responsible for the oversight, maintenance and policy making decisions of CSP Sac. He was at all relevant times herein responsible for setting and enforcing the policies, customs and practices of CSP Sac. In addition, defendant Baughman was responsible for the supervision, training and hiring of persons and employees working within CSP Sac including correctional officers and other employees within CSP Sac. Defendant Baughman is sued in both his professional and individual/personal capacities for his own culpable action or inaction in the training, supervision or control of his subordinates, or for his acquiescence in the constitutional deprivations which this complaint alleges, or for conduct that showed a reckless or callous indifference to the rights of others, including the Price family.

14. The true names of Does 1 through 15, inclusive, are unknown to plaintiffs at this time. Defendants are current and former employees of CDCR. Defendants were acting under color of state law when they conspired to cover up the misconduct of other CDCR employees in causing the death of Mr. Price. Doe defendants are currently being sued in their individual capacities. Plaintiffs believe the identities of defendants will be revealed through discovery and will permit plaintiffs to amend this complaint to state the same.

15. Plaintiffs are informed and believe, and thereon allege that each defendant is, and at all times mentioned was, the agent, employee, representative successor and/or assignee of each other defendant. Each defendant, in doing the acts, or in omitting to act as alleged in this

4

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

complaint, was acting within the scope of his or her actual and apparent authority or the alleged acts and omissions of each defendant as agent were subsequently adopted and ratified by each other defendant as principal. Plaintiffs are informed and believe that each of the individual defendants was in some way responsible for the constitutional violations and torts alleged in this complaint.

16.     In committing the acts alleged in this complaint, defendants acted knowingly, maliciously and with reckless or callous disregard for the constitutional rights of Mr. Price, justifying an award of punitive damages under federal law against each defendant.

### FACTS

17.     At all times relevant herein, all wrongful and unlawful acts described herein were performed under color of state law and/or in concert with or on behalf of those acting under the color of state law.

18.     California Code of Regulations, Title 2, Section 172 provides in relevant part "All ... employees in the state civil service shall possess the general qualifications of integrity, honesty, dependability, industry, thoroughness, accuracy, good judgment, imitative, resourcefulness, courtesy.. The foregoing general qualifications shall be deemed to be a part of the personal characteristics of the minimum qualifications .."

19.     CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations.."

20.     CDCR Health Care Department Operations Manual 3.1.19 requires the Warden or his/her designee to notify an inmate's next of kin within 24 hours of death, serious illness or

5

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                      V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

serious injury.

21. The code of silence is a term used to denote the informal code of silence among correctional [and other] officers not to report on a colleague's errors, misconducts, or crimes.

22. CDCR employees, and specifically those assigned to CSP Sac, who violate the code of silence by reporting misconduct by their fellow officers are harassed and retaliated against. For example, in November 2016 a man named Milton Beverly, Jr., died while at CSP Sac. Correctional Officers claimed Beverly hung himself in his cell. However, one officer was prepared to testify another inmate confessed to murdering Beverly. According to that officer the evidence of the murder was covered up. The officer reported the misconduct to defendants Baughman and Lynch who failed to act and Plaintiffs are informed and believe that the officer who reported misconduct was harassed and retaliated against after doing so.

23. Beginning no later than 2016, one or more officers filed multiple reports with defendants Baughman and Lynch, as well as other high-ranking employees of CDCR, alleging rampant corruption and the continued existence of a "code of silence" within CSP Sac. Despite these reports, it took nearly two years for CDCR to complete its investigation into the allegations in the instant case. That allowed at least one defendant, Pacheco, to be sued for excessive force that occurred on a subsequent occasion.

### Facts Relating to Ronnie Price's Death

24. On September 15, 2016, Mr. Price was assaulted by defendant Arturo Pacheco as defendant Pacheco and defendant Aurich escorted Mr. Price between buildings.

25. On September 15, 2016, Defendant Pacheco was instructed by Sergeant Brenda Villa to move Mr. Price from a cell in Building 6A to a cell in Building 7A as part of a cell compaction. Building 6A and Building 7A are and were located on the grounds of CSP Sac, where Mr. Price was incarcerated.

26. Defendant Pacheco and defendant Aurich went to Building 6A to get Mr. Price. Officer Pacheco informed Mr. Price he was being moved to another cell with a new cellmate. Mr. Price requested to be taken to Administrative Segregation instead of being housed with the proposed new cell mate. Mr. Price agreed to be handcuffed and escorted to Administrative

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                         V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

Segregation.

27.    Defendant Arturo Luna and Officer Roger Lynch were also present for this conversation.

28.    Defendants Pacheco, Aurich and Luna escorted Mr. Price. Officer Lynch stayed behind to collect Mr. Price's belongings. Defendant Bigney opened the yard door for defendants Aurich, Luna and Pacheco.

29.    Defendant Pacheco informed Mr. Price he was being taken to his new cell. Mr. Price stated he was not going to the new cell and stopped walking.

30.    While being observed by Defendants Aurich, Luna, and Bigney, Defendant Pacheco squatted down, placed his shoulder on Mr. Price's buttock area, grabbed Mr. Price's quadriceps and intentionally pushed Mr. Price forward with his body weight while Price still had his hands handcuffed behind his back. Defendant Pacheco's unjustified use of force caused Mr. Price to fall violently forward onto his face impacting the concrete floor.

31.    The impact of Mr. Price's head striking the concrete floor caused him to break his jaw, several teeth and injure his right shoulder.

32.    Defendants Aurich and Luna made no attempts to prevent defendant Pacheco from slamming Mr. Price into the cement.

33.    Defendant Bigney could have seen this incident from his vantage point had he not violated CDCR policy and covered his windows, blocking his view.

34.    Despite the fact the technology existed, CSP Sac did not have video surveillance cameras. CSP Sac correctional officers did not wear body cameras, which had been available for a number of years.

35.    After Mr. Price crashed face first into the concrete floor, defendant Aurich sounded the alarm. Defendants Villa, Bigney and Lopez were among the first to arrive at the scene.

36.    Defendant Villa instructed defendant Aurich to get a camera and take photos.

37.    Defendant Lopez and Officer Todd Jones relieved defendant Pacheco and escorted Mr. Price to medical. Medical staff immediately determined Mr. Price needed to be sent to UC

7

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

Davis Medical Center to receive emergency medical.

38. At UC Davis Medical Center, Mr. Price received extensive emergency medical care and was hospitalized.

39. On or about September 16, 2016, Mr. Price gave a recorded interview to Kevin Steele in which he told the investigator what happened to him:

a. Price told correctional Sgt. Kevin Steele that officers used deception to convince him to go with them, that they told him he was being moved to administrative segregation — "the hole" — after Price refused to be moved to a cell with another cellmate.

b. "I asked him why he couldn't come down here and move into a cell with me," Ronnie Price told Steele. "He said, they do too much drug testing in the six building.

c. "So, my thing is, if you're not using drugs it doesn't make a difference how much drug testing they do. So, when he said they do too much drug testing it set off an alarm in my head that this is a problem. ... In my mind, I'm not going to get involved with this one. I'm 65 years old. If I can stay out of trouble I'm out on the street."

d. Price recounted the attack to Steele as he was in a hospital gurney with his hands and legs cuffed, and said that when correctional officers first came to his cell to move him they told him he was going to be moved in with the other cellmate.

e. "I said, I'm not going down to the cellblock," Ronnie Price said on the videos. He added that he understood refusing a guard's order could cause him disciplinary problems.

f. "I was willing to take the punishment," he told Steele. "If I go to the cell and I get caught up I'm going to spend years wishing I had tried to get out of a jam."

g. Initially, Price said, guards cuffed his hands behind his back and led him out of his cell, but then put on leg restraints, also, and began moving toward the new cellblock.

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*　　　　　　　　　　　　　　　V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

h. When Price realized he wasn't being taken to "the hole," he said he stiffened to stop, but did not resist more because he knew that would cause more problems.

i. "Two of them grabbed my right arm and they said, you're going to the cell," Price said. "I told them I'm not going to that cell. They said, you're going."

j. He added that he knew "if I hurt anybody I was going to be in trouble."

k. When he stopped moving forward, "somebody stepped on my (leg) shackles, they pushed me," he said.

l. Price fell face first onto the concrete, breaking out two of his dentures and two of his natural teeth, he said.

m. "When I raised my head up to spit my teeth out, somebody grabbed my head and slammed it into the ground," he said. "That's when it broke my jaw."

40. Upon information and belief, Baughman and Lynch knew or should have known about the recorded interview.

41. On or about September 17, 2016, Mr. Price died as a result of the assault by defendant Pacheco. The Sacramento County Coroner subsequently ruled Mr. Price's death a homicide.

### Facts Relating to the Notification of Mr. Price's Death

42. Defendants Baughman and Lynch did not notify Mr. Price's next of kin consistent with the requirements of CDCR Health Care Department Operations Manual 3.1.19.

43. Around September 24, 2016, Sergeant Kevin Steele, member of the Investigative Services Unit ("ISU") since 2015, called JoAnne Price's cellphone and informed her that Ronnie Price had passed away. He identified himself as a member of the Investigative Services Unit and deceived Ms. Price by informing her that Mr. Price was hit in the jaw by a cellmate. Sergeant Steele did not give Ms. Price the name of the cellmate. However, Sergeant Steele gave Ms. Price 916 numbers to call for more information. Sergeant Stelle also inquired about how Ms. Price wanted to handle Ronnie Price's remains. Not knowing Defendants were responsible for Mr. Price's death, Ms. Price elected to have Mr. Price cremated.

44. The family reasonably relied upon the representation by the prison as to the cause

9

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*        V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

of Ronnie's death and the family had no reason to question the cause of death.

45. Ms. Price and her family were concerned about whether the cellmate would receive an extended sentence for Mr. Price's death. Accordingly, Ms. Price and her family called the 916 numbers about 20-30 times, every day for about one month. Every time Ms. Price or her family called, the number would ring and ring with no answer or option to leave a voicemail. Nobody ever answered the 916 number the family was provided.

46. Due to the concealment of the cause of Mr Price's death, Ms. Price was not given the opportunity to request an autopsy.

47. To date, Ms. Price has not received any of Mr. Price's belongings or ashes from CSP. Ms. Price was never given a document to sign for the release of the remains.

### **Facts Relating to the Cover Up**

48. On September 15, 2016, defendant Villa sent an email with the subject "IR 0824" to defendants Bigney, Pacheco, Aurich, Luna, Lopez and Officer Todd Jones regarding the incident with Mr. Price.

49. Defendant Villa's email included a document titled "IR Price 0824.doc." The email contained the phrase "Resisting a Peace Officer Resulting in the UOF (Physical)." This email was sent to provide pertinent information for the incident reports.

50. Although she was required to do so, defendant Villa did not submit a report about the incident.

51. Despite the fact defendant Luna was present for the entire incident, defendant Villa intentionally did not collect a report from defendant Luna.

52. After the responding officers left the scene, defendant Villa spoke with defendants Pacheco, Aurich, Lopez and Bigney regarding who was going to be documented in the incident reports.

53. There was an agreement between defendants Villa, Pacheco, Lopez, Aurich and Bigney not to include references to defendant Luna in the incident report.

54. When questioned why defendant Luna was being omitted from the incident report, defendant Villa told defendant Aurich to "keep it between the Block" or words to that effect,

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.* V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

referring to the fact defendant Luna worked in a different building.

55. Defendant Villa's instructions to other officers to 'keep it between the Block" and omit references to defendant Luna was an act of engaging in a code of silence and encouraging staff to do the same.

56. Defendant Villa received reports from defendants Lopez, Aurich, Pacheco, Bigney and Officer Jones.

57. Defendant Villa made substantive changes to several of these reports. The substantive changes removed factual information and/or added specific details which did not accurately reflect the events that occurred, covering up the unlawful use of unnecessary and excessive force resulting in Mr. Price's death.

58. Defendants Lopez, Aurich, Pacheco and Bigney subsequently signed the falsified reports.

59. Defendants Villa, Pacheco, Aurich, Bigney, Lopez and possibly other defendants, had conversations in person, via telephone and text messages regarding fabricating a cover story.

60. Defendant Luna initially drafted a report about the incident.

61. However, Defendant Luna did not submit his report, despite the fact he was required to do so.

62. Among the reasons defendant Luna did not submit a report was because defendant Pacheco told defendant Luna not to do so.

63. Subsequently, defendant Luna acknowledged he knew defendant Pacheco used excessive force against Mr. Price and failed to report Pacheco's wrongful conduct.

64. Defendant Luna was interviewed by CDCR's Office of Internal Affairs (OIA) on at least two occasions. In the first interview he denied having written a report about defendant Pacheco's use of excessive force against Mr. Price.

65. In his second OIA interview, defendant Luna lied about not having drafted a report, claiming he should have done so, until he was confronted with a copy of the report he drafted but did not submit.

66. Defendant Luna lied in his reports and during the OIA interviews in an attempt to

11

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                          V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

cover his and his codefendants' wrongful conduct.

67. Defendant Bigney wrote a report about the incident. That report involved several drafts. The final version of the report submitted by defendant Bigney contained material misrepresentations designed to hide the fact defendant Luna was present during the assault. Additionally, there were other material misrepresentations about defendant Pacheco's conduct.

68. Defendant Bigney was interviewed by OIA on at least two occasions. In those interviews Bigney lied about his conduct and the conduct of other officers.

69. Defendant Bigney lied in his reports and during the OIA interviews in an attempt to cover his and his co-defendants' wrongful conduct.

70. Defendant Lopez wrote a report about the incident with Mr. Price.

71. Defendant Lopez lied in his report about the events involving Mr. Price. Specifically, defendant Lopez lied and claimed defendant Luna was not present. Defendant Lopez also lied about defendants Pacheco's and Aurich's positions and actions upon defendant Lopez's arrival at the scene.

72. Defendant Lopez was interviewed by OIA on at least two occasions. During those interviews he lied about his conduct and the conduct of other officers.

73. Defendant Lopez lied in his reports and during the OIA interviews in an attempt to cover his and his co-defendants' wrongful conduct.

74. Defendant Pacheco wrote a report about the incident with Mr. Price. Defendant Pacheco lied in his report about the events involving Mr. Price. Specifically, defendant Pacheco lied and claimed Mr. Price was resisting.

75. Defendant Pacheco lied about having cause to slam Mr. Price to the ground. Defendant Pacheco also claimed defendant Luna was not present.

76. Defendant Pacheco was interviewed by OIA on at least two occasions. During those interviews he lied about his conduct and the conduct of other officers.

77. Defendant Pacheco lied in his reports and during the OIA interviews in an attempt to cover his and his co-defendants' wrongful conduct.

78. Defendant Aurich wrote a report about the incident with Mr. Price. Defendant

12

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

Aurich lied in her report about the events involving Mr. Price. Specifically, defendant Aurich lied and claimed Mr. Price was resisting.

79. Defendant Aurich lied about defendant Pacheco slamming Mr. Price to the ground without cause. Defendant Aurich also claimed defendant Luna was not present.

80. Defendant Aurich was interviewed by OIA on at least two occasions. During those interviews she lied about her conduct and the conduct of other officers.

81. Defendant Aurich lied in her reports and during the OIA interviews in an attempt to cover her and her co-defendants' wrongful conduct.

82. Defendant Villa was interviewed on at least two occasions by OIA. She lied in both of those interviews.

83. Defendant Villa lied during the OIA interviews in an attempt to cover her and her co-defendants' wrongful conduct.

84. On or about October 3, 2016, defendant Pacheco texted defendant Aurich, stating "I work with snitches."

85. On October 3, 2016, defendant Luna was interviewed by OIA. Defendant Pacheco sent a text message to defendant Aurich after learning defendant Luna was being interviewed. That text message was part of a pattern and practice among the correctional officers at CSP Sac to maintain a code of silence and to harass and intimidate any officer who violated the code.

86. Defendants Baughman and Lynch became aware of defendants Pacheco and Aurich's text conversation by the Spring of 2017. Despite being aware of this conduct, Pacheco, Aurich, as well as the other defendants, continued to work at CSP Sac for more than another year.

87. On or about February 19, 2017, defendant Lopez texted an unknown individual about the code of silence at CSP Sac. Defendant Lopez stated "LOL! Code of Silence homie" and "you know it."

88. No action was taken against Lopez for her "Code of Silence text for an entire year. Instead, Lopez continued her employment and was not sanctioned or reprimanded for admitting she was concealing the truth.

///

13

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

**Facts Relating to Baughman and Lynch Concealing**

**the Truth About Mr. Price**

89.    Defendants Baughman and Lynch became aware of defendant Lopez's text conversation no later than the Spring of 2017. Despite being aware of this conduct defendant Lopez continued to work at CSP Sacramento for more than another year.

90.    On or about June 25, 2018, defendants Villa, Pacheco, Aurich, Luna, Lopez and Bigney were fired due to the aforementioned conduct.

91.    The Notice of Adverse Action terminating defendant Lopez's employment acknowledges the existence of the code of silence at CSP Sac. The notice states "When confronted with the above text message exchange, you [defendant Lopez] confirmed that you had indeed authored the text messages referring to the "code of silence" at CSP-SAC...." While the Notice of Adverse Action goes on to state that the code of silence is not allowed, the notice confirms the code of silence exists.

92.    The Notice of Adverse Action was signed by defendant Baughman.

93.    Accordingly, Baughman was aware of the truth pertaining to Mr. Price's death on or before June 25, 2018 (within the two-year statute of limitations for the causes of action at issue). However, no one informed Ms. Price or her family about the truth of his death and concealed the truth of the death from Ms. Price and her family.

**Facts Relating to Baughman and Lynch's Knowledge of Conduct that Could Inflict**

**Unconstitutional Conduct**

94.    Upon information and belief, in 2016 as Warden, Baughman was responsible for the supervision of all prison officials, including the named Defendants.

95.    Upon information and belief, in 2016 as Warden, Baughman was responsible for the safe keeping of all prisoners.

96.    Upon information and belief, in 2016 as Assistant Warden, Lynch was responsible for supervising the named Defendants.

97.    Upon information and belief, Baughman and Lynch intentionally concealed the truth, and Plaintiff was therefore unable to discover the truth regarding what happened to Mr.

14

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                          V. James DeSimone Law

Case No.: 2:22-cv-1610 DAD-DMC (PC)

Price.

98. Defendant Lynch began working for CDCR in 1994. He has worked at CSP Sac on multiple occasions since at least 1996. In September 2011, Lynch accepted an Associate Warden position at CSP Sac. Lynch was promoted to Chief Deputy Warden in August 2016. In June 2020 Defendant Lynch was named Warden of CSP Sac.

99. Defendant Lynch had actual and/or constructive knowledge of the pervasive culture of lying and dishonesty among certain guards at CSP Sac.

100. Defendant David Baughman began working for CDCR in 1991. At the time of Mr. Price's death, David Baughman was acting warden and had been with CDCR for roughly 25 years.

101. Defendants Baughman and Lynch had actual and/or constructive knowledge of the Code of Silence at CSP Sac.

102. Prior to Mr. Price's death, defendants Baughman and Lynch received reports from other correctional officers complaining of a culture of corruption resulting in the use of excessive force against inmates.

103. In May 2016 Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. In a text message to a friend, he later joked that the incident was "funny" and claimed it's "all about how u write ur report," so long as "ur partners have ur back." "Blood, broken glass, n just u n ur partners. … Green light!" Pacheco texted.

104. Upon information and belief, Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force.

105. After Mr. Price's death, but more than a year before defendants Villa, Pacheco, Aurich, Luna, Lopez and Bigney were fired, defendants Baughman and Lynch received additional reports from other correctional officers complaining about the code of silence, corruption, and/or other wrongful conduct. Defendants Baughman and Lynch took no timely corrective action.

106. The existence of the code of silence at CSP Sac is well known among the inmates and staff at CSP Sac. Supervisors and correctional staff, including but not limited to defendants Lynch, Bauman, Villa, Pacheco, Aurich, Bigney, Luna and Lopez, knew the code of silence was

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

preventing the dissemination of factual information about Mr. Price's death.

107. No later than June 1, 2018, and likely substantially before that date, defendants Baughman and Lynch knew Mr. Price died as a result of defendant Pacheco's conduct.

108. On a date unknown, but before June 1, 2018, the Sacramento County Coroner's Office ruled Mr. Price's death a homicide.

### Facts Relating to Ms. Price's Notification Surrounding the Truth of Mr. Price's Death

109. No later than June 1, 2018, and likely substantially before that date, defendants Baughman and Lynch were also aware that defendants Pacheco, Aurich, Villa, Luna, Bigney and Lopez lied and conspired to cover-up the true circumstances surrounding Mr. Price's death.

110. Despite that, defendants Baughman and Lynch failed to provide Mr. Price's next of kin with the truthful information regarding his death in violation of California Code of Regulations Title 2, Section 172.

111. At all times herein plaintiff JoAnn Price's telephone number and address were easily obtainable online, using a telephone book. CDCR has access to confidential databases. In fact, CDCR had Ms. Price's telephone number because they contacted her after Mr. Price's death.

112. No one at CDCR made an adequate, reasonable or diligent attempt as required by California law to notify Mr. Price's next of kin of the true cause of his death. Instead, CDCR deliberately concealed the facts surrounding Mr. Price's death and, instead, provided a bogus phone number for them to call which was deliberately unstaffed and rendered useless by the lack of basic capabilities, including an answering machine, for a family member to leave a message and contact information.

113. On or around July 22, 2022, Ms. Price received a letter from attorney Kresta Daly. Ms. Daly stated that she was involved in a wrongful death and cover up case occurring at CSP where prison guards were believed to be involved in a murder. The letter continued: "[w]e recently learned about a potentially [sic] situation involving another person, Ronnie Price, and believe you may have important information." For the first time since Mr. Price's death, his family was told the truth that the prison guards were believed to be responsible for Mr. Price's death.

///

16

THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

114.    Upon receiving the letter Ms. Price and her family initiated an internet search and became aware of prison guard's potential involvement in the death of Mr Price.

115.    Prior to receiving Ms. Daly's letter, Ms. Price had no clue that Mr. Price was killed by a prison guard and instead, believed Mr. Price was killed by his cellmate because that is the lie she was told by CDCR. The instant action was filed less than two months after the family was notified of the potential wrongdoing.

116.    Due to defendants' failure to properly notify Mr. Price's next of kin of the true cause of his death, and their conspiracy to conceal the truth from Mr. Price's family, plaintiffs did not and could not file a claim under California Tort Claims Act Government Code §§ 810, et seq.".

117.    Plaintiffs contend that the agents and employees of the State of California failed in their statutory duties under both California and Federal law, including violations of the Eighth and Fourteenth Amendments of the United States Constitution by failing to provide protection to decedent, thereby depriving decedent and plaintiffs of their civil rights.

118.    Each defendant acted with deliberate indifference to or, reckless disregard for, an accused's rights for adequate safety in a custodial facility.

119.    As a direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, decedent suffered great fear, physical and mental suffering, anguish, confusion, anxiety, nervousness, and ultimately, loss of life during the time period in which CDCR failed to provide appropriate protection.

120.    As a direct and proximate result of the acts, omissions, customs, practices, policies and decisions of the defendants, plaintiffs have suffered great mental and physical pain, suffering, anguish, fright, nervousness, anxiety, shock, humiliation, indignity, embarrassment, harm to reputation, and apprehension, which have caused plaintiffs to sustain damages in a sum to be determined at trial.

///

///

///

17

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                        V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

## THE STATUTE OF LIMITATIONS IS TOLLED

121.    Defendants falsely reported and covered up their assault of Mr. Price. Prison authorities have never appraised plaintiffs of the true circumstances and cause of Mr. Price's death or of the fact that defendants were responsible for Mr. Price's death and tried to cover that fact up.

122.    Plaintiffs are informed and believe and thereon allege that defendants Pacheco, Aurich, Villa, Lopez, Luna and Bigney were fired in June 2018. Among the reasons they were fired was for dishonesty in the investigation of this case.

123.    Despite the fact that defendants Baughman and Lynch knew in 2018 that defendants Pacheco, Aurich, Villa, Lopez, Luna and Bigney lied about the circumstances surrounding Mr. Price's death, plaintiffs were not informed of the true cause of Mr. Price's death.

124.    Based on the death and investigation occurring within a prison, Plaintiff was not able to readily access facts or information without the assistance of prison officials.

125.    By knowingly and intentionally failing to inform plaintiffs of the true cause of Mr. Price's death, defendants Baughman and Lynch and Does 3 through 15 furthered the conspiracy to cover up the true cause of Mr. Price's death. Their conduct further tolled the statute of limitations.

126.    Plaintiffs could not bring a claim for the wrongful death of Mr. Price because they were not notified of the true cause of Mr. Price's death.

127.    In United States District Court, Eastern District of California Case No. 2:20-CR-221, defendant Pacheco entered guilty pleas to two violations of Title 18, United States Code Section 242, deprivation of civil rights under color of authority and two counts of violations of Title 18, United States Code Section 1519, falsification of records in federal investigation.

128.    Some of those guilty pleas related to defendant Pacheco's assault upon Mr. Price and his subsequent cover-up of that assault.

129.    Mr. Price is not identified by name in defendant Pacheco's plea agreement. Had plaintiffs read the plea agreement they would not have known the identity of the victim.

///

18

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                                          V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

130. On or about January 19, 2021, defendant Aurich pled guilty in United States District Court, Eastern District of California to a violation of Title 18, United States Code Section 1519, falsification of records in federal investigation.

131. Defendant Aurich's guilty pleas were directly related to her complicity in falsifying records to assist defendant Pacheco's cover-up of his felonious and deadly assault on Mr. Price.

132. Mr. Price is not identified by name in defendant Aurich's plea agreement. Had plaintiffs read the plea agreement they would not have known the victim was their brother.

133. At a time unknown to plaintiffs, but prior to 2018, the Federal Bureau of Investigation ("FBI") and/or other state and federal law enforcement agencies, began investigating CSP Sac.

134. Plaintiffs are informed and believe that defendants Pacheco's and Aurich's conduct came to light and the result was the filing of two separate criminal indictments in late 2020. Despite this fact, neither the FBI, CDCR, the United States Attorney's Office nor any other law enforcement agency informed plaintiffs of the true facts which led to Mr. Price's death and the subsequent cover-up of defendant Pacheco's criminal conduct.

135. Plaintiffs remained unaware of the facts surrounding their brother's death and cover-up until the events were reported in the news in late July 2022 around the time of defendant Pacheco's guilty plea.

136. Typically an action accrues on the date of injury. That rule can be modified by the "discovery rule." The discovery rule provides that the accrual date of a cause of action is delayed until the plaintiff is aware of their injury and its cause, and (1) the exercise of reasonable diligence and a good-faith investigation would not have disclosed the cause, or (2) did not know of facts that would have caused a reasonable person to suspect the harm was caused by someone's wrongful conduct.

137. Plaintiffs had no knowledge of the true facts surrounding Mr. Price's death until defendant Pacheco's plea agreement and guilty plea. Plaintiffs had no means by which to discover the truth prior to late July 2022.

138. Equitable estoppel prevents the statute of limitations from starting to run where

19

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.* V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

there is concealment of information as to the cause of a plaintiff's injuries. Fraudulent concealment by a defendant will equitably estop the starting of the running of the statute of limitations.

139. Defendants Pacheco and Aurich recently pled guilty for their dishonest conduct, specifically for lying about the cause of Mr. Price's death.

140. Given defendants' lies, plaintiffs had no means of discovering the truth about Mr. Price's death until defendant Pacheco's guilty plea and subsequent media coverage.

141. Beginning well before Mr. Price's death CSP Sac has a history of tolerating misconduct amongst correctional officers. Whistleblowers, known and unknown to plaintiffs, made complaints to defendants Baughman and Lynch, the California Secretary of Corrections, and others. Plaintiffs are informed and believe and thereon allege those complaints documented dishonest conduct such as the planting of drugs and other evidence, assaults on inmates, and falsifying evidence and reports among other issues.

142. Whistleblowers are believed to have provided information and evidence to investigators relating to Mr. Price's death and/or the related cover up. Defendants Baughman and Lynch failed to take appropriate action concerning the serious circumstances of the present case.

143. Before Mr. Price's death defendants Baughman and Lynch repeatedly failed to take appropriate action concerning serious instances of excessive force and unlawful conduct of the guards and staff of CSP Sac.

144. Defendants Baughman, Lynch and Does 3-15, were actually or constructively aware of a pattern or culture of excessive force, unlawful conduct, lying and dishonesty among correctional officers at CSP Sac.

145. Defendants Baughman, Lynch and Does 5-15, maintained and permitted policies, practices and customs which sanctioned such wrongful conduct.

///

///

///

20
**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*      V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

## FIRST CAUSE OF ACTION

## Violation of 42 U.S.C. Section 1983— Eighth Amendment—Convicted Prisoner's Claim for Excessive Force

### (Against Defendants Pacheco, Bigney, Luna and Does 1 and 2)

146.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint.

147.    Defendant Pacheco brutally assaulted Mr. Price, slamming him into the ground while he was in handcuffs, which ultimately resulted in his death, without justification. Defendant Pacheco's conduct constituted excessive force against plaintiff in violation of his Eighth Amendment rights.

148.    Defendants Bigney, Luna and Doe Defendants 1 and 2 aided and abetted defendant Pacheco's wrongful conduct by failing to intervene in defendant Pacheco's wrongful conduct. Defendants are further liable as integral participants as they participated in the violation in a meaningful way.

149.    The actions of defendants Pacheco, Bigney, Luna and Doe Defendants 1 and 2 as alleged herein interfered with the enjoyment of Mr. Price's civil rights as guaranteed by the Eighth Amendment to the U.S. Constitution.

150.    As a direct and proximate result of defendants Pacheco, Bigney, Luna and Doe Defendants 1's and 2's conduct, Mr. Price suffered the damages alleged herein, including but not limited to unreasonable interference with his personal liberty, pain, suffering and the loss of his life.

151.    Defendants Pacheco, Bigney, Luna and Doe Defendants 1's and 2's conduct caused Mr. Price's death and deprived plaintiff JoAnn Price of her brother's love and affection.

152.    Plaintiff seeks loss of life damages, survivor damages, and pre-death pain and suffering damages for violation of Decedent's rights. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)(holding that California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy and approving of the reasoning that "[I]f Section 1983 did not allow recovery for loss of life

21

notwithstanding inhospitable state law, deterrence would be further subverted since it would be more advantageous to the unlawful actor to kill rather than injure."); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167 (N.D. Cal. 1981), disapproved of on other grounds by *Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984) ("A remedy must obtain by reason of the actual deprivation-in this case the greatest of deprivations, loss of life. Absent such a remedy, the s 1983 action amounts to little more than a tort claim.")

153. Plaintiffs allege the acts and conduct of defendants Pacheco, Bigney, Luna, and Doe Defendants 1 and 2 were willful, malicious, intentional, oppressive and reckless and/or were done in willful and conscious disregard of plaintiff's rights, welfare and safety, thereby justifying the award of punitive and exemplary damages in an amount to be determined at trial.

154. Plaintiff brings this claim as the successor in interest and seeks attorneys' fees under this claim.

WHEREFORE, plaintiffs pray for judgment as hereinafter set forth.

## SECOND CAUSE OF ACTION

### Violation of California Civil Code Section 52.1 (Bane Act)

### (Against Defendants Pacheco, Bigney, Luna and Does 1 and 2)

155. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint.

156. The actions of defendants Pacheco, Bigney, Luna and Does 1 and 2, as alleged herein, interfered with the exercise and enjoyment of Mr. Price's civil rights guaranteed by Article I, Sections 1 and 13 of the California Constitution. Specifically, defendant Pacheco, with the acquiescence of Bigney, Luna and Does 1 and 2, interfered with Mr. Price's rights using threats, intimidation, and coercion when defendant Pacheco grabbed a handcuffed Price by the legs and drove him into the ground, causing Price to violently hit his head on the cement.

157. Defendants Pacheco, Bigney, Luna and Does 1 and 2's actions and failure to intervene in Pacheco's assault on Mr. Price constituted an excessive use of force in violation of the eighth amendment, a violation of Mr. Price's right to bodily integrity, and further interfered with Mr. Price's personal rights as guaranteed by California Civil Code Section 43.

22

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**

*Price, et al. v. Arturo Pacheco, et al.*                                                                      V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

158. As a direct and proximate result of defendants' actions and/or omissions, Mr. Price suffered unreasonable interference with his personal liberty, physical injury, pain and suffering, humiliation, emotional distress and other injuries.

159. Defendants' violations of decedent's rights as guaranteed by California Civil Code § 52.1 (Bane Act) entitles plaintiffs to compensatory and punitive damages and attorneys' fees as provided for in Sections 52.1(b) and 52 and requested herein.

160. The aforementioned acts and/or omissions of said defendants were willful, intentional, wanton, reckless and/or accomplished with a conscious disregard for decedent's rights as secured by Civil Code Section 52.1, thereby entitling plaintiffs to an award of punitive damages under Section 52(b)(1).

161. Plaintiff brings this claim as the successor in interest and seeks attorneys' fees under this claim.

WHEREFORE, plaintiffs pray for judgment as hereinafter set forth.

## THIRD CAUSE OF ACTION

### Supervisory Liability for Violation of Civil Rights 42 U.S.C. Section 1983

### (Against Defendants Baughman, Lynch, Villa and Does 3 through 15)

162. Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint.

163. Defendants Warden or Acting Warden Baughman, Associate Warden Lynch, Sgt. Villa and Does 3 through 15 acted individually and in concert with each other, under color of law, in the course and scope of their employment with CDCR, in violating Mr. Price's and constitutionally protected rights. Baughman, Lynch, Villa and Does 3 through 15 are sued in their individual capacities as supervisors, managers, and/or administrators.

164. At all times herein mentioned defendants Baughman, Lynch, Villa and Does 3 through 15 were responsible for the safety of inmates and for training officers to comply with CDCR Operations Manual, Article 2.

165. At all times herein mentioned, defendants Baughman, Lynch, Villa and Does 3 through 15 had the power and authority to adopt policies and prescribe rules, regulations, and

23

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

practices affecting all facets of training, supervision, control, employment, assignment and operation of CSP Sac where Mr. Price was under its sole control and custody.

166. At all times herein mentioned, defendants Baughman, Lynch, Villa and Does 3 through 15 were responsible for devising and implementing the security protocols and procedures for the safe housing, classification, and transport of inmates at CSP Sac, as well as all procedures, policies and directives concerning the training, manner and practices by which correctional staff, including defendants Pacheco, Aurich, Lopez, Luna, Bigney and Does 1 and 2 were to handle and monitor inmates and to quell any disturbances at CSP Sac.

167. The acts and omissions of defendants Baughman, Lynch, Villa and Does 3 through 15 and their subordinates, including, but not limited to, defendants Pacheco, Aurich, Lopez, Luna, Bigney and Does 1 and 2, deprived Mr. Price and plaintiffs of their protected rights under the laws of the United States, the U.S. Constitution, and the Constitution of the State of California.

168. Prior to the death of Mr. Price, defendants Baughman, Lynch, Villa and Does 3 through 15 committed the following acts and omissions:

(a) Failure to supervise and train their subordinates to ensure they were implementing and complying with policies and procedures to ensure the reasonable safety and security of inmates;

(b) Failure to supervise or train their subordinates to ensure they did not violate the law CDCR Operations Manual Section 51020.4, *et seq.,* defining, among other things, reasonable force and excessive force; CDCR Operations Manual Section 51020.7, defining deadly force and when deadly force may be used, CDCR Operations Manual Section 51020.10 and CDCR Operations Manual Section 51020.11 defining the application and immediate use of force; CDCR Operations Manual Section 51020.12 defining when a controlled use of force is permissible, CDCR Operations Manual Section 51020.12.3 requiring the use of video recording when a correctional officer engages in a controlled use of force; failure to install video cameras on the grounds of the prison and/or equip correctional staff with body cameras;

(c) Failure to supervise or train their subordinates to ensure they did not violate the law CDCR Operations Manual Section 51020.17 defining use of force reporting requirements;

24

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                      V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

CDCR Operations Manual Section 51020.17 requiring all involved staff file reports on the use of force;

(d)     Failure to supervise or train their subordinates to ensure they did not violate the law CDCR Operations Manual Section 31140.9 requiring staff to report the misconduct of their co-workers; CDCR Operations Manual Section 33030.3.1, code of conduct, providing, among other things, that CDCR employees are to be honest and follow the law; CDCR Operations Manual Section 33030.3.2 requiring CDCR employees to "possess the general qualifications of integrity, honesty, sobriety, dependability ... [and] good judgment...."

(e)     Failure to discipline and establish procedures to correct past violations of CDCR policy, including the existence of the "code of silence," and to prevent the future violations of constitutional rights of inmates by condoning, ratifying, and/or encouraging the violation of inmates' constitutional rights including those of Mr. Price;

169.     Defendants Baughman, Lynch, Villa and Does 3 through 15 knew or should have known their subordinates, including but not limited to defendants Pacheco, Aurich, Luna, Lopez, Bigney and Does 1 and 2, were engaging in the above alleged acts, patterns and practices, and knew or reasonably should have known their subordinates' conduct posed a significant and foreseeable risk of harm to inmates, including Mr. Price, from a failure to properly train and supervise those subordinates, and thus depriving inmates including Mr. Price, of their constitutional right to be free from cruel and unusual punishment under the Eighth Amendment of the U.S. Constitution. As a consequence, this also violated plaintiffs' constitutional rights of familial relationship under the Due Process Clause of the Fourteenth Amendment of the U.S. Constitution.

170.     Defendants Baughman, Lynch, Villa and Does 3 through 15 failed to prevent their subordinates, including defendants Pacheco, Aurich, Luna, Lopez, Bigney and Does 1 and 2, from engaging in the above alleged patterns, practices and acts.

171.     Defendants Baughman, Lynch, Villa and Does 3 through 15 were deliberately indifferent to the need to supervise and train their subordinates, including defendants Pacheco, Aurich, Luna, Lopez, Bigney and Does 1 and 2, and the lack of supervision and training actually

25

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

caused the constitutional harm or deprivation of rights alleged herein. Subordinates, including defendants Pacheco, Aurich, Luna, Lopez, Bigney and Does 1 and 2 disregarded the known and obvious consequences that an omission in their training programs, lack of supervision and failure to equip the facility or officers with cameras, would cause their subordinates to violate inmates' constitutional rights.

172.     The above acts represent defendants Baughman, Lynch, Villa and Does 3 through 15's own culpable action or inaction in the training, supervision or control of their subordinates, their knowledge of and acquiescence in the unconstitutional conduct of their subordinates for which the complaint is made, or conduct that showed a reckless or callous indifference to the rights of others. *Starr v. Baca,* 652 F.3d 1202, 1207 (9th Cir. 2011).

173.     Defendants Baughman, Lynch, Villa and Does 3 through 15's conduct as alleged herein was so closely related to the deprivation of Mr. Price and plaintiffs' rights as to be the moving force that caused the ultimate injuries.

174.     Each defendant, Baughman, Lynch, Villa and Does 3 through 15, acted individually and in concert with each other in violating Mr. Price's and, consequently plaintiffs', constitutionally protected rights; and are jointly and severely liable for the damages demanded herein.

175.     Plaintiff JoAnn Price brings this claim on her own behalf and as successor in interest to the decedent Mr. Price on behalf of the Estate of Ronnie Price and seeks survival damages under this claim for relief.

176.     As a direct and proximate result of the customs, practices, policies and/or procedures of said defendants, or as a result of defendants' failure to promulgate appropriate policies or procedures, decedent Mr. Price suffered the damages alleged herein, including but not limited to physical pain and suffering, emotional distress, mental anguish and loss of his life. These defendants are liable to the Estate of Ronnie Price for survival damages which include general damages for Mr. Price's pre-death pain and suffering *(Chaudhry v. City of Los Angeles,* 751 F.3d 1096 (9th Cir. 2014))* and loss of life/loss of enjoyment of life *(Valenzuela v. City of Anaheim*, No. 20-55372 (9th Cir. 2021)).

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

177. Plaintiff seeks loss of life damages, survivor damages, and pre-death pain and suffering damages for violation of Decedent's rights. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)(holding that California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy and approving of the reasoning that "[I]f Section 1983 did not allow recovery for loss of life notwithstanding inhospitable state law, deterrence would be further subverted since it would be more advantageous to the unlawful actor to kill rather than injure."); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167 (N.D. Cal. 1981), disapproved of on other grounds by *Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984) ("A remedy must obtain by reason of the actual deprivation-in this case the greatest of deprivations, loss of life. Absent such a remedy, the s 1983 action amounts to little more than a tort claim.")

178. As a direct and proximate result of the acts and omissions by defendants Baughman, Lynch, Villa and Does 3 through 15, plaintiff suffered emotional distress and anguish, loss of the love, comfort, support, services, companionship and society of her brother, and which she will continue to suffer for the rest of her natural life justifying an award of damages to be determined at trial. These defendants are liable to plaintiff for the unwarranted state interference in her familial relationship with her brother.

179. Exemplary and punitive damages are requested and warranted under Title 42 United States Code Section 1983 against defendants Baughman, Lynch, Villa and Does 3 through 15 in their personal capacities because their conduct was callous, willful, wanton, malicious, oppressive, and motivated by evil intent or involved reckless or conscious disregard for the federally protected rights of Mr. Price and plaintiff and constitute the type of despicable conduct that no civilized society should be forced to endure.

180. Plaintiff brings this claim as the successor in interest and seeks attorneys' fees under this claim.

///

///

///

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

# FOURTH CAUSE OF ACTION

## WRONGFUL DEATH

### (Cal. Code of Civil Procedure § 377.60, *et seq.*)

### (Against Defendants Baughman, Lynch, Villa, Pacheco, Aurich, Bigney, Luna and Does 1 and 2)

181.    Plaintiffs reallege and incorporate herein by reference each and every allegation contained in the preceding paragraphs of this Amended Complaint.

182.    Plaintiff JoAnn Price is the sister of the decedent Mr. Price, who has no surviving spouse or surviving children or issue of children.

183.    The acts and/or omissions by defendants Baughman, Lynch, Pacheco, Aurich, Bigney, Luna and Does 1 and 2 as detailed below directly and proximately caused the wrongful death of Mr. Price and were the direct and proximate cause of plaintiffs' injuries entitling plaintiffs to recover damages under Code of Civil Procedure Section 377.60, *et seq.*

184.    Baughman, Lynch, and Villa are liable as their negligent supervision was the cause of Mr. Price's death entitling plaintiffs to recover damages under Code of Civil Procedure Section 377.60, *et seq*.

# FIFTH CAUSE OF ACTION

## Violation of Civil Rights 42 U.S.C. Section 1983— Eighth Amendment—Convicted Prisoner's Claim of Failure to Protect

### (42 U.S.C. § 1983)

### (Against Defendants Baughman, Lynch, Villa and Does 3 through 15)

185.    On behalf of decedent Price, plaintiffs re-allege and incorporate by reference paragraphs 1 through 160, as though fully set forth herein.

186.    The acts and/or omissions of defendants Baughman, Lynch, Villa and Does 3 through 15 in failing to properly investigate prior claims of physical abuse, excessive, force, and the existence of a "code of silence" were done with a clear disregard for Mr. Price's rights under the Eighth Amendment.

187.    Defendants Baughman, Lynch, Villa and Does 3 through 15 and other

28

supervisory and correctional officers employed at CSP Sac failed to take reasonable steps to protect inmates, including the failure to install video monitoring and/or body cameras at CSP Sac, even though they knew and were aware that allegations of violence and dishonesty by prison staff were common.

188. Defendants Baughman, Lynch, Villa and Does 3 through 15 observed and received information that would lead any reasonable person to believe staff misconduct occurred and they failed to take reasonable steps to prevent this misconduct. These decisions and conditions put Mr. Price at substantial risk of suffering serious harm and death and he in fact suffered serious harm and death.

189. Defendants Baughman, Lynch, Villa and Does 3 through 15 did not take reasonable available measures to abate the risk, even though a reasonable individual in the circumstances would have appreciated the high degree of risk involved and obvious potential consequences.

190. By not taking such measures, defendants Baughman, Lynch, Villa and Does 3 through 15 caused Mr. Price's injuries and death.

191. As a direct and proximate result of said acts and/or omissions by defendants Baughman, Lynch, Villa and Does 3 through 15, Mr. Price suffered injuries, death and damages as alleged herein and to which his estate is entitled to recover damages for pain and suffering, mental and emotional distress, costs and attorneys' fees.

192. Plaintiff seeks loss of life damages, survivor damages, and pre-death pain and suffering damages for violation of Decedent's rights. *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1105 (9th Cir. 2014)(holding that California's prohibition against pre-death pain and suffering damages limits recovery too severely to be consistent with § 1983's deterrence policy and approving of the reasoning that "[I]f Section 1983 did not allow recovery for loss of life notwithstanding inhospitable state law, deterrence would be further subverted since it would be more advantageous to the unlawful actor to kill rather than injure."); *Guyton v. Phillips*, 532 F. Supp. 1154, 1167 (N.D. Cal. 1981), disapproved of on other grounds by *Peraza v. Delameter*, 722 F.2d 1455 (9th Cir. 1984) ("A remedy must obtain by reason of the actual deprivation-in this

case the greatest of deprivations, loss of life. Absent such a remedy, the s 1983 action amounts to little more than a tort claim.")

193. The acts and/or omissions of said defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of Mr. Price thereby entitling plaintiffs to an award of exemplary and punitive damages according to proof.

**SIXTH CAUSE OF ACTION**

**Concealment**

**(Against Defendants Baughman, Lynch and Does 3 through 15)**

194. Plaintiff restates and incorporates by reference, as though fully set forth herein, each and every allegation set forth above.

195. According to Civil Code section 1710(3) a deceit is "The suppression of a fact, by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact."

196. Defendants, and each of them, intentionally failed to disclose to Plaintiff facts that were known only to it, that Mr. Price was killed by law enforcement officials, and that Plaintiffs could not have discovered.

197. Defendants had a duty so speak because of the prior notification in which the family was informed Mr. Price was killed by another inmate.

198. Defendants intended to deceive Plaintiff by concealing the truth about Mr. Price's death.

199. Had the omitted information been disclosed, Plaintiff would have behaved differently and filed a lawsuit within the statute of limitations for the above mentioned claims.

200. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the aforementioned damages. Plaintiff is therefore entitled to general and compensatory damages in a sum in excess of the minimum jurisdiction of the Court and according to proof at trial.

201. The acts and/or omissions of said defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of Mr. Price thereby entitling plaintiffs to an award of exemplary and punitive damages according to proof.

30

202. Plaintiff brings this claim in her individual capacity.

## SEVENTH CAUSE OF ACTION

### Intentional Misrepresentation

### (Against Defendants Pacheco, Bigney, Luna and Does 1 and 2)

203. Plaintiff restates and incorporates by reference, as though fully set forth herein, each and every allegation set forth above.

204. Defendants made false statements regarding the death of Mr. Price.

205. According to Civil Code section 1710(1) a deceit is "The suggestion, as a fact, of that which is not true, by one who does not believe it to be true."

206. Defendants knew the representation was false or made the representation recklessly without regard for its truth.

207. Defendants are responsible for a representation that was not made directly to Plaintiff because Defendants made the representations pertaining to the death and reasonably expected that it would be repeated to a next of kin or family member.

208. The statements were made with the intent to induce Plaintiff's reliance on the fact misrepresented.

209. Plaintiff justifiably relied on the statement regarding Mr. Price's death.

210. As a direct and proximate result of Defendants' conduct, Plaintiff suffered the aforementioned damages. Plaintiff is therefore entitled to general and compensatory damages in a sum in excess of the minimum jurisdiction of the Court and according to proof at trial.

211. The acts and/or omissions of said defendants were willful, wanton, malicious and done with conscious or reckless disregard for the rights and safety of Mr. Price thereby entitling plaintiffs to an award of exemplary and punitive damages according to proof.

212. Plaintiff brings this claim in her individual capacity.

///

///

///

31

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

## JURY DEMAND

Plaintiffs hereby demand a jury trial on all issues so triable.

Date: December 15, 2023

**V. JAMES DESIMONE LAW**
**LAW OFFICE OF ANNEE DELLA**
**DONNA**

By: _____
V. JAMES DESIMONE, ESQ.
RYANN E. HALL, ESQ.
ANNE DELLA DONNA, ESQ.

Attorneys for Plaintiffs,

JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

## **PRAYER**

WHEREFORE plaintiffs request entry of judgment in their favor and against defendants as follows:

        (1)    For compensatory damages in an amount to be determined at trial;

        (2)    For punitive damages against individual defendants in an amount to be proven at trial;

        (3)    For reasonable costs of this suit and attorneys' fees; and

        (4)    For such further relief as the Court may deem proper, just and appropriate.

Date: December 15, 2023

**V. JAMES DESIMONE LAW**
**LAW OFFICE OF ANNEE DELLA DONNA**

By: _____
    V. JAMES DESIMONE, ESQ.
    RYANN E. HALL, ESQ.
    ANNE DELLA DONNA, ESQ.

    Attorneys for Plaintiffs,

    JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest

**THIRD AMENDED COMPLAINT FOR DAMAGES FOR VIOLATION OF CIVIL RIGHTS**
*Price, et al. v. Arturo Pacheco, et al.*        V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)

# EXHIBIT B

# Deposition Transcript

Case Number: 2:22-cv-1610 DAD-DMC (PC)

Date: January 21, 2026

In the matter of:

# JOANN PRICE v ARTURO PACHECO, et al.

# DAVID BAUGHMAN - ██████████

██████████████████████



Reported by:
Holly Thuman



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

point in time, you'll have an opportunity to make any changes that you feel are necessary.  However, I have to caution you that if you make any substantive changes -- for instance, if you changed a "yes" to a "no" -- that can affect your credibility at the time of trial.

So it's very important we get your best testimony here today.  Okay?

A.   Okay.

Q.   Is there any reason why you cannot give your best testimony today?

A.   No.

Q.   Are you on any medication that may affect your ability to give your best testimony today?

A.   No.

Q.   Okay.  I want to make sure -- Baughman.  Correct?

A.   Correct.

Q.   Would you like me to refer to you as Officer Baughman or Mr. Baughman?

A.   Mr. Baughman is fine.

Q.   Be okay.  How long were you the warden at Sacramento Prison?

A.   I became acting warden around April 2016, and I was sworn in as warden in January 2017.

DAVID BAUGHMAN - ███████████ ████████████████    JOB NO. 2336392
JANUARY 21, 2026

Q.   At the time of this incident, you were the acting warden.   Correct?

A.   Yes.

Q.   And prior to April 2016, had you been warden at another prison?

A.   No.

Q.   Okay.   Prior to April 2016, had you worked at Sacramento Prison?

A.   Yes.

Q.   In what capacity?

A.   Chief deputy warden.

Q.   So, in other words, you were promoted in April 2016 to acting warden.   Would that be fair?

A.   Yes.

Q.   And how long were you deputy warden?

A.   I'm not quite sure.   Approximately a year.

Q.   Okay.   And this is probably another admonition I should have given you.

     We're all entitled to your best estimate.

A.   Okay.

Q.   So, you know, like you said, "about a year," that's fine.   But we want you to make sure that when you're answering a question, you do your best to give your best estimate and don't guess.

     You understand the difference between an

investigation, and what their final analyses were, I can make an assumption from what ultimately happened with their dismissals, that it was determined that their reports were untruthful.

Q.   Okay.  So it's your understanding, as you sit here today, that the initial reports prepared by Pacheco and Aurich were false.  Fair?

A.   Correct.

Q.   Okay.  And that it's your understanding that the reports of Aurich and Pacheco did not accurately describe the force of use used on Ronnie Price.  Fair?

A.   Yes.

Q.   And was it -- strike that.

As is it your understanding today that the officers' failure to accurately report their use of force was a coverup of how Mr. Price was injured?

MR. GILLE:  Objection.  Vague and ambiguous as to the term "coverup."

But you can answer.

THE WITNESS:  Yes.

MR. GILLE:  Annee, we've been going for about an hour.  If we can get to a place where we can take a break, I'd appreciate it.

MS. DELLA DONNA:  And this is a good place

couple questions before we get started, and then I'll try and blow this up so I can tell her what paragraph.

Q. Did you contact the OIA to initiate an investigation?

A. Yes.

Q. And on what date did you contact the OIA?

A. I don't know.

Q. It's our understanding that OIA started investigating after September 17.

Does that sound about right?

A. Correct.

Q. And did you initiate a use-of-force review process as warden?

A. No.

Q. Do you know if anyone did at your prison?

A. Not at our prison, and the reason being is that when Mr. Price passed away, it automatically goes to a Deadly Force Investigations team, which is Internal Affairs.

Q. Got it. So there was no initiation of a use-of-force review process. Fair?

A. Correct.

Q. But on the 17th, after Mr. Price passed away, the deadly force review process was

instituted through OIA.  True?

A.  I believe so, yes.

MS. DELLA DONNA:  Okay.  So can you blow this up a little bit more to "Incident Commander-Reporting Requirements"?

Ah, there we go.

51020.17.  Let's look at that for a minute.

Q.  So were you the incident commander for this use-of-force incident as warden?

A.  No.

Q.  Who was?

A.  I don't remember.

Q.  Okay.  But you recall notifying OIA. True?

A.  Not specifically, no, but I -- I believe I did.

Q.  Did you also notify the Office of Inspector General?

A.  That would have been procedure, yes.

Q.  And -- and again, you don't recall when you notified OIA.  True?

A.  True.

Q.  Okay.  But according to 51020.17.7, you're required to notify OIA one -- no later than

one hour from the time the incident is discovered

of serious bodily injury that could have been

caused by staff use of force.  True?

A.  True.

Q.  And this section talks about being

relieved from duty.

Is it your understanding that this section

talks about being relieved from the duty to

investigate once OIA comes onto the scene?

A.  Where is it --

Q.  Well, let me just ask you this:  Is it

your understanding that once OIA is notified, that

you are relieved of your duty to investigate the

incident?

A.  Yes.

Q.  Okay.  So under 51020.17.7, it says:

Prior to being relieved from duty,

incident commander or designee shall initiate

the initial incident report.

Do you know if that initial incident

report was initiated?

A.  I would have to make an assumption, but I

would say yes.

Q.  And that that initial incident report:

...shall be an accurate summary of the

events as described in the written reports submitted by all employees.

Q.    Was that your understanding of your duties under this provision?

A.    Yes.

Q.    And that:

...the incident commander or designee shall review all incident reports for quality, accuracy, and content.

Was that your understanding of your duty under this provision?

A.    Yes.

Q.    And:

The incident commander or designee shall clarify incomplete reports with involved staff by completing a CDCR 837-C-2 Review Notice.

Was that your understanding of your duty under this section?

A.    Under my duty as warden, or incident commander?

Q.    Either, either warden or incident commander.

A.    The incident commander is the lieutenant on the facility.  That would have been

the incident commander.

Q. Do you believe as warden in 2016 you had a duty under this provision to clarify incomplete reports with involved staff?

A. That would be through the chain of command. And then, ultimately, if it -- let's say, for example, it didn't rise to the level of investigation or potential investigation to OIA, then the use-of-force committee could ask for clarification on reports.

MS. DELLA DONNA: Move to strike as nonresponsive.

Holly, could you read my question back, please?

(Record read as follows:

"QUESTION: Do you believe as warden in 2016, you had a duty under this provision to clarify incomplete reports with involved staff?")

THE WITNESS: Yes.

BY MS. DELLA DONNA:

Q. And take a moment to look at 51020.17.7.

Can you read that okay, or do you need us to blow it up a little more?

A. I think -- I've been -- I did okay.

DAVID BAUGHMAN -                                    JOB NO. 2336392
JANUARY 21, 2026

Q.   Okay.  So take a minute to look at that whole section.

A.   (Reviewing document.)

Okay.

Q.   Okay.  Do you see anything in this section that states that you as warden cannot supervise or discipline the officers involved in this incident even though OIA started their own investigation?

A.   No.

Q.   And, as warden, did you have the authority to initiate a use-of-force process?

MR. GILLE:  Objection.  Vague and ambiguous as to the term "process."

But you can answer if you know.

THE WITNESS:  The use-of-force process is -- and review is done once all the reports are collected and forwarded up through the chain of command for their review for potential clarification requests and responses, and then it's reviewed by the use-of-force committee.

BY MS. DELLA DONNA:

Q.   I'm not going to move to strike; I'll just ask it again.  Maybe you didn't understand.

So as warden back in 2016, did you have the authority yourself to initiate a use-of-force

process?

A.  I routinely did, based upon the use-of-force policy.

Q.  Okay.  And did you initiate a use-of-force process for the Ronnie Price incident on September 15?

A.  No.

Q.  And did you initiate a use-of-force review process for the Ronnie Price incident on September 16?

A.  No.  That would have been premature.

Q.  Okay.  And same thing on September 17:  Do you recall initiating a use-of-force review process?

A.  No.  That would have been inappropriate.

Q.  And why would it have been inappropriate?

A.  Because the use-of-force resulted in Mr. Price's death, and therefore referred to Deadly Force Investigations -- OIA.

Q.  Got it.  Okay.

Ryann, you can take that down.  Thank you so much.  Sorry for making you be Vanna White today.

MS. HALL:  No problem.

//

BY MS. DELLA DONNA:

Q.   As warden back in 2016, can you tell me everything you did to investigate this incident on September 15?

A.   Wardens do not conduct investigations. Investigations are not conducted at the institution level.  They're conducted by Internal Affairs.

Q.   Okay.  Did you question any witnesses involving this incident?

A.   No.

Q.   Did you yourself prepare any report regarding this incident?

A.   No.

Q.   Do you recall seeing an email from Officer Sharts to Officer Pacheco where he provided a similar fact pattern that Pacheco used in his report dated September 15?

A.   No.

Q.   Did you later learn that that had -- that email had occurred?

A.   I don't remember that.

Q.   And as warden back in 2016, tell me everything you did to make sure that the officers involved in the use-of-force incident with Ronnie Price were not communicating with one

another in the preparation of their reports.

A.   There was no way I could do that.

Q.   And why not?

A.   Because there was not a practice or a policy which states that we must separate all involved employees into separate locations to prevent them from communicating at all.

Employees during training are trained not to collaborate on their written reports and that their reports must be individual, based upon their observations and their actual, I guess, practices that they used during the incident.

So to answer your question more specifically, through training in report writing, that's where they would have been told not to collaborate and -- regarding writing their written reports.

Q.   Okay.  So as warden in 2016, after the Ronnie Price incident, was there anything preventing you from putting these officers in separate rooms and having them write their report and turn them in immediately thereafter?

A.   As soon as the incident happened?

Q.   After the incident happened, yes.

A.   That is not common practice.  That would

not have been common practice, and that would have -- how would you say -- I guess, appear that I assumed inappropriate conduct before anything was ever written simply based upon a verbal account of what occurred, which is not -- I mean, as far as I know, not any common practice in any law enforcement environment.

Q.   You later learned, did you not, that these officers -- Aurich, Pacheco, and Luna -- or, sorry, Aurich, Pacheco, and Villa -- collaborated with their report-writing on September 156789 true?

A.   Yes.

Q.   And, again, was there anything that prevented you on September 15, after the incident, from putting the officers in different rooms and having them write their report immediately after the incident?

A.   Other than it being bizarre?

MR. GILLE:   I'll just make a belated objection.   It's vague as to time.

BY MS. DELLA DONNA:

Q.   So on September 15, was there anything that physically prevented you from putting these officers in separate rooms and having them fill out their reports?

do you think you have left?

MS. DELLA DONNA:  Yeah, let's take a lunch break.

You know, how much time do you need, Ryan?

MR. GILLE:  I don't need any.  Oh, you mean for lunch?  Sorry.

MS. DELLA DONNA:  Lunch.  How much does your client need?

MR. GILLE:  Probably around 30 minutes.

MS. DELLA DONNA:  Okay.  Do you want to come back around 1:10, 1:15?

MR. GILLE:  Sure.

THE WITNESS:  The time is 12:37.  We are now going off the record.

(Deposition Exhibits 1 through 3 were marked for identification.)

(Lunch recess from 12:37 P.M. to 1:29 P.M.)

--oOo--

AFTERNOON SESSION

THE VIDEO OPERATOR:  I am staring at the monitor, and we are recording.  The time is 1:29. We are now going back on the record.

BY MS. DELLA DONNA:

Q.  Good afternoon.

Prior to Ronnie Price's death, did you have any concerns about Officer Pacheco?

MR. GILLE:  Objection.  Vague and ambiguous as to "concerns."

But you can answer if you understand the question.

THE WITNESS:  I know he was written a letter of instruction for off-duty conduct where he showed up, I believe, at a relative's graduation or something in full uniform with a sidearm, and I don't recall exactly how we found out, but it was obvious -- I mean, anyway, it was unsettling to the people that were there at the graduation.  So he was issued a letter of instruction.

BY MS. DELLA DONNA:

Q.  Was he disciplined in any way for anything with his employment with the Sacramento Prison prior to Ronnie Price's death?

A.  No.

Q.  Did he require additional training involving his employment with Sacramento Prison prior to Ronnie Price's death?

A.  Not that I'm aware of.

Q.  What about the other officers --
Officer Villa?  Any concerns prior to --

        A.   I don't know.

        Q.   Would you agree that, as the warden in 2016, you had a duty to investigate in good faith every staff use of force?

        A.   Could you repeat the question?

             MS. DELLA DONNA:   Yeah.

             Holly, could you please read it back?

             (Record read as follows:

             "QUESTION:  Would you agree that, as the warden in 2016, you had a duty to investigate in good faith every staff use of force?")

             THE WITNESS:  So, to clarify, the -- no, in that the warden does not have the authorization to investigate use-of-force incidents.

             It's the warden's responsibility and their staff to review use-of-force incidents and make an assessment.  It's up to Internal Affairs to conduct investigations.

BY MS. DELLA DONNA:

        Q.   So you're allowed to review incidents but not investigate.

        A.   Correct.

        Q.   So what's the difference?

        A.   Investigation is a -- it's a formal

# EXHIBIT C

# Deposition Transcript

Case Number: 2:22-cv-1610 DAD-DMC (PC)

Date: January 22, 2026

In the matter of:

# JOANN PRICE v ARTURO PACHECO, et al.

# JEFFREY LYNCH



Reported by:
Danielle Krautkramer



Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

involved in it.

Q    Do you recall what your exact title was at the time of the Ronnie Price incident?

A    I'm uncertain, but to the best of my recollection, I believe I just accepted an acting chief deputy warden position.

Q    And when these type of e-mails occurred, is it just for potential excessive force, is it for any incident?  What's the basis for creating one of these e-mails as you described usually?

A    Ordinarily it would be anything that qualified as an incident per policy.  Sometimes they could be just unusual occurrences that didn't qualify as an incident.

Q    And in this group e-mail you describe, would it be an attachment to the e-mail with maybe a form or a write-up or would the text be in the e-mail itself of the substance?

A    It could be both.

Q    Okay.  And then was there a file or a place that these kind of reports would go to from there as far as you were concerned?

A    When you say file of the report, are you talking about the e-mail or the incident documentation itself?

not aware either way.

Q   Okay.  When an incident like this occurred, was there any policy on September 16th for the officers to be separated into separate rooms to prepare their incident reports to avoid collaboration?

A   No.

Q   Prior to the Price incident, had you ever had complaints about Pacheco using excessive force?

A   Not to my recollection.

Q   Was it your understanding that at some point these officers were fired or discharged?

A   Yes.

Q   And did you have any role or involvement in that decision?

A   No.

Q   Who would've had that decision?

A   The warden or -- the warden is also referred to as the hiring authority.

Q   All along we have been saying the warden. What is the warden's full name that you have been referring to?

A   David Baughman.

Q   Was there any other wardens that you dealt with with respect to the Price incident?

A    No.

Q    Did you personally have any concerns by way of your job supervising the officers from the date of the incident to their transfer about population safety at the prison?

A    Not that I recall.

Q    Prior to the Price incident, did you have any experience with officers covering up matters or what's been deemed or labeled the code of silence?

A    Not that I recall.

Q    Is it true that you and the warden had no duty -- strike that.

Is it true that you and the warden had no power to place these officers on leave or discipline them until OIA completed their investigation?

A    When you say leave or discipline, that means a couple different things.

Q    Either one is fair for this question.

A    Discipline -- in terms of discipline, our ability to discipline -- the warden's ability to discipline happens at the conclusion of internal affairs investigations.  Removing staff from posts and putting them, say, on ATO or in the mail room can happen before.

Q    Did you have any responsibility in notifying

# EXHIBIT D

# Deposition Transcript

Case Number: 2:22-cv-1610 DAD-DMC (PC)

Date: June 25, 2026

In the matter of:

# JOANN PRICE v ARTURO PACHECO, et al.

# Tony Diaz



Reported by:
Emma Ridge

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

death was that approximately?

A.   I'm not sure.  Sorry, I'd have to go back, view the report.  But it was in the latter part, final stages of the criminal investigation.

Q.   So, in other words, you agree that Pacheco was dishonest in the initial reporting, but later in the criminal investigation changed his story; fair?

A.   Yes.

Q.   Okay.  Specifically, you agree Pacheco falsely reported that only Officer Aurich was present and observed what happened?

A.   Yes.

Q.   And, again, with respect to the plaintiffs' allegations against Pacheco relating to the code of silence, you agree they're true?

MR. GILLE:  Objection.  Vague and ambiguous as to time.

A.   What I -- I'm sorry, sir, go ahead.

MR. GILLE:  I just put an objection on the record.  Go ahead.

A.   What I would say is that it is clear that Mr. Pacheco, as well as a group of other individuals, acted in concert amongst themselves and themselves only to clearly not report what

they did, how they did it, who was present when they did it, and what others did.

BY MR. DUBIN

Q.   Why do you say themselves only?

A.   I feel it was an isolated group of -- the actions were based on the actions of an isolated group, not a culture or not what is expected by the hiring authorities or anybody else.

In my opinion, this was a group of individuals that acted solely amongst themselves on this specific incident to not be transparent, not report truthfully what took place, and as a result of that, it resulted in multiple investigations, and as a result of those investigations, a lot of that information was corroborated.

Q.   Okay.  We'll get to all that eventually.

But, basically, how many people need to be involved for you to feel it's systematic and not isolated?

MR. GILLE:  Objection.  Incomplete hypothetical.  Lacks foundation.

You can answer.

A.   Sure.  I wouldn't get into

hypotheticals, that's not what I'm here for.  But what I would say is that it was pretty evident, in my opinion, that the actions of the individuals that were investigated did not go outside of that group.

This was a group that acted amongst themselves, and that this wasn't a culture, if you will, or this wasn't something that was initiated, promoted, or instilled by people other than the individuals themselves who were involved in the incident.

BY MR. DUBIN

Q.   In fact, you were hired to say that exact same thing; fair?

MR. GILLE:  Objection.  Argumentative.

BY MR. DUBIN

Q.   I'm sorry?  That's your catchphrase for this lawsuit, that it's isolated and not cultural and so forth; fair?

MR. GILLE:  Objection.  Argumentative.

But you can answer.

A.   Sure.  What I was hired to do was to look at all of the information and give an opinion.  Irregardless of whether the opinion was in favor of the plaintiffs or the defendants, it

testimony.

BY MR. DUBIN

Q.   Is that what you're saying?

A.   Again, I -- I can repeat word for word, what I'm saying is:  If -- when you're using the word defendant, if you want to name one specific individual, I would be able to respond to that. But if you're using defendant --

Q.   I'll be more -- I'll be more specific, that's fair.

Did the supervisors or warden know about Pacheco's prior use of force incident relating to pepper spray?

A.   I don't believe that they did until the investigation took place.

Q.   And you have no criticism whatsoever of that?

A.   Of what, sir, specifically?

Q.   Wardens and supervisors not knowing that a prison guard is assaulting an inmate?

MR. GILLE:  Objection.  Misstates the testimony.  Incomplete hypothetical.

A.   So, again, there was no information that was presented to me that at the time of the pepper spray incident, prior to the investigation, that

A.   -- unless you tell me I can do that, but they're in my report --

Q.   You can.

A.   -- I believe that I indicated that the actions of Mr. Pacheco in regards to the statements he made about the pepper spray incident were discovered in the latter during the Price investigation, and that the administrators or the hiring authority wasn't aware at the time of the pepper spray incident that the things that Pacheco stated took place.

MR. DUBIN:  Okay.  We're getting closer, but I'm going to move to strike and have the court reporter read it back again.

(THEREUPON, the court reporter read back the referred-to portion of the record.)

BY MR. DUBIN

Q.   Why don't you mention any of that in your report?

A.   Again, I don't have my report in front of me, but I did address the issue with the pepper spray.  My response is going to be the same, is that it was discovered post-incident during the Price investigation.

And at that point, obviously,

Mr. Pacheco had a lot of other things going on; and so I didn't see anything that was presented to me that would indicate that anybody had any knowledge that Mr. Pacheco acted inappropriately during the pepper spray incident, until it was discovered through the forensics and whatnot that took place during the Price investigation.

Q.   And you have no criticism of all that as the expert witness for defendants; true?

MR. GILLE:  Objection.  Vague and ambiguous.  Criticisms of what?

MR. DUBIN:  Everything you just said.

MR. GILLE:  Yeah.  Objection.  Vague and ambiguous.

You can answer if you understand.

THE WITNESS:  Yeah, I don't.  Mr. Dubin, ask me, and I'll answer your question.  I just -- I need the specifics.  So if there's --

MR. DUBIN:  Sure.

THE WITNESS:  -- something specifically you want to ask me, ask me, and I will respond.

MR. DUBIN:  Yeah, I'm going to have the court reporter read back my question.  I'm

Price death; fair?

A. Well, this is -- according to this appeal, there were --

Q. Is this fair? The question was: Is that fair, yes or no?

A. No, I don't understand how you're -- what you're asking me on that, and that if you want to break it down for me, then maybe I can give you a response.

MR. DUBIN: Fair enough. Emma, could you read it back, and I'll see if that helps.

(THEREUPON, the court reporter read back the referred-to portion of the record.)

A. Yes.

BY MR. DUBIN

Q. I guess I'm confused, because I thought your prior testimony was Pacheco's risk was not known prior to the Price incident; it was, wasn't it?

A. No, sir. And I'm not going to do a play of words with you, I'm going to try and be as transparent as I can with you.

I'll just repeat myself again that, at the time of this review, there was no evidence to indicate that Mr. Pacheco had violated a policy or

procedure, and the evidence that they did discover, they discovered through forensics, and they discovered that post-Mr. Price's incident, and that's how they discovered the statements that Mr. Pacheco had made.

So at the time that this document was authored by Lieutenant Kiel and signed by Baughman, neither had any knowledge of the actions of Mr. Pacheco.

Q. Would you agree, if the warden did not provide corrective training and documentation after the pepper spray incident, because I think you said it would be required, and the warden personally signed off on the denial of the Houston complaint, that would indicate the warden had notice of Pacheco's risk of unreasonable force?

MR. GILLE: Objection. Incomplete hypothetical.

But you can answer.

A. I would say no. Again, I don't see the word denial, I don't see anything that would indicate in this August 11th document that either Kiel or Baughman would have had any information that would have indicated that Pacheco violated a policy, which, in turn, would have initiated some

type of corrective action plan, whether it was

remedial training or disciplinary action.

BY MR. DUBIN

Q.   Did the warden provide any corrective

training to Pacheco after the pepper spray

incident?

MR. GILLE:  Objection.  Asked and

answered.

BY MR. DUBIN

Q.   Yes or no?

A.   Not that I'm aware of.

Q.   And to wrap this up and move on:  It's

your expert opinion that the warden had no notice

prior to the Price death that Pacheco was a risk

to use unreasonable force on inmates; fair?

A.   That's correct.

Q.   Do you agree that one of the purposes of

the supervisor review would be to identify and

reconcile conflicting accounts on submitted forms?

A.   Sir, when you say a supervisor review, a

review of what?  What are we referring to?

Q.   Reports.

A.   As in a use of force incident or

specifically Mr. Price's incident?

Q.   Yeah, I'm just limiting to Price.

BY MR. DUBIN

Q.   Is it fair that you did not review any documents showing that Warden Baughman did in response to the Houston complaint we discussed?

A.   That's true.

Q.   And it's fair you were not given any documents to review showing what Warden Baughman did in response to the pepper spray incident we have discussed?

A.   That's correct.

Q.   And it's fair to say you're not given to review any document showing what Chief Deputy Warden Lynch did in response to the Steele whistle-blower memorandum; fair?

A.   Yes, sir, that's correct.

Q.   And is it fair that your opinion that the wardens did nothing wrong is based on evidence that they acted properly -- strike that.

See if I can simplify this a little bit. Let me just ask this last question, then we can take our break.

Sir, is it fair to say that your expert opinion on this matter that the wardens did nothing wrong is based not on evidence that they acted properly, but on the absence of evidence of

wrongdoing?

MR. GILLE:  Objection.  Vague and ambiguous.

You can answer.

A.    Sure.  My opinion is based on the documents that I reviewed, including the two extensive investigations that didn't disclose any indicators or any evidence that Baughman or Lynch were aware and failed to act properly.

BY MR. DUBIN

Q.    That's what I'm asking, and you're kind of just throwing the question back at me.

So your expert opinion isn't that the wardens acted properly based on all the record available, your expert opinion is you've seen no documents indicating the wardens did anything wrong; is that fair?

MR. GILLE:  Objection.  Vague and ambiguous.

A.    My opinion is as it's stated in the report, sir.  If we need to go to that, we can.

I based my opinion on all of the information -- excuse me -- that was provided to me, including the two extensive investigations, and I didn't see any evidence that indicated that

either one of those individuals violated a policy or procedure.

BY MR. DUBIN

Q.   Did you see any -- any evidence that Warden Baughman or Lynch acted properly at all points of the Price investigation?

A.   I don't understand.  Are you talking about in the totality of the investigative process, or what time frame are you referring to?

Q.   Sure.  Totality.

A.   I didn't see that they did anything wrong during that time frame, no.

Q.   Please listen closely, Mr. Diaz, and then we'll take our break, okay?

A.   Sure.

Q.   Did you see any findings that Baughman and Lynch acted proper during all facets of the Price death investigation?

MR. GILLE:  Objection.  Vague and ambiguous.

You can answer.

A.   No.

MR. DUBIN:  Let's take a 10-minute well-earned break.  I'll see you guys back at about 2:11ish.

# EXHIBIT E

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

-----------------------------------------------------

JOANN PRICE, successor )
in interest to Ronnie )
Price, deceased; and the)
ESTATE OF RONNIE PRICE; )
and his successor in )
interest, )
                                    )
            Plaintiffs, ) Case No.
                                    ) 2:22-cv-1610-DAD-DMC (PC)
vs.                                 )
                                    )
ARTURO PACHECO, ASHLEY )
MARIE AURICH, JEFFREY )
BIGNEY, ARTURO LUNA, )
BRENDA VILLA, DAVID )
BAUGHMAN, JEFFREY LYNCH )
AND DOES I through 15, )
inclusive, in their )
official and )
personal/individual )
capacities, )
                                    )
            Defendants.  )

------------------------

REMOTE ZOOM VIDEO DEPOSITION OF

CHAVEZ, commencing at 9:00 A.M. on Wednesday, March

25, 2026, before JORI L. MOORE, Certified Shorthand

Reporter 1993, in and for the State of Washington.

Steno.concierge@steno.com
(888)707-8366

A. Yes.

Q. Prior to that incident did you know Correctional Officer Arturo Pacheco?

A. I knew of him.  Did not know him personally.

Q. When you say you knew of him, what did you know of him?

A. He was a fairly new officer that worked on the same facility that I worked.

Q. Did he have any type of reputation that you were aware of?

A. No.

Q. Did you -- prior to the incident did you know of Brenda Villa, who I believe was a sergeant at the time?

A. I did.  I knew of sergeant, but I didn't know her personally.

Q. And when you say you knew of her, is that just that you knew that she was -- she worked in your facility?

A. That is correct.

Q. And prior to the incident did you know Correctional Officer Diego Luna?

A. No.

Q. And prior to the incident did you know Correctional Officer Dorian Lopez?

A. No.

A. Was I aware of the concept of the code of silence?
Yes.

Q. In September 16th was the code of silence a part of the culture at CSP Sacramento?

MR. GILLE:  Objection.  Vague and ambiguous. Calls for speculation.  Lacks foundation.  You can answer if you know.

A. No, it wasn't.

Q. And on what do you base that opinion?

A. CSP Sac (sic) is a very complex prison with many, many moving parts to it.  And people move in jobs a lot. Their -- I have never in my career seen anybody try to come together and -- and make a code of silence.

Q. Are you aware of allegations that officers in CSP Sacramento who did not follow the code of silence faced alienation from colleagues?

A. No.

Q. After your hospital shift on September 16th why did you not immediately come forward and inform somebody about what Mr. Price told you?

A. That is just conversation between the inmate and me. I didn't know anything about the incident other than what Inmate Price told me.  And it's just -- it was conversation between an officer and a convict at the hospital.

# EXHIBIT F

# Deposition Transcript

Case Number: 2:22-cv-1610 DAD-DMC (PC)
Date: March 19, 2026

In the matter of:

# JOANN PRICE v ARTURO PACHECO, et al.



# OFFICER A█████ CHAVEZ - VOL. II

Reported by:
TRACY JONES



**CERTIFIED COPY**

Steno
Agency, Inc.

315 West 9th Street
Suite 807
Los Angeles, CA 90015
concierge@steno.com
(888) 707-8366
NV: Firm #108F

that engaging in the code of silence violated CDCR policy, correct?

A.   Yeah.

Q.   Was there a culture at CSP Sac in 2016 where officers were expected to abide by the code of silence?

ATTORNEY GILLE:  Objection:  Calls for speculation; lacks foundation.

You can answer if you know.

THE WITNESS:  No.  Not that I know.

BY ATTORNEY HALL:

Q.   Are you aware of officers who faced retaliation from their fellow officers due to a perception that they violated the code of conduct at CSP Sacramento?

A.   I'm sorry.  Could you repeat?

Q.   Sure.

Are you aware of officers who allege that they faced retaliation from fellow officers when the officers believed the first officer violated the code of silence?

A.   No.

ATTORNEY GILLE:  Objection:  Vague and ambiguous; calls for speculation; lacks foundation.

# EXHIBIT G

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

Case No:  2:22-cv-1610 DAD-DMC (PC)
Assigned to Hon. Dennis M. Cota

JOANN PRICE, successor in interest to Ronnie
Price, deceased; and the ESTATE OF RONNIE
PRICE; and his successors in interest,

Plaintiffs,

V.

ARTURO PACHECO, ASHLEY MARIE
AURICH, JEFFREY BIGNEY, ARTURO
LUNA, BRENDA VILLA, DAVID
BAUGHMAN, JEFFREY LYNCH and DOES 1
Through 15, inclusive, in their official and
Personal/individual capacities,

Defendants.
_____X

DEPOSITION OF
ARTURO PACHECO

TAKEN ON BEHALF OF THE DEFENDANT

DATE:  March 31, 2026
TIME:  9:47 a.m. PT
PLACE: Via Remote Telephone
       Job 2580052

EXAMINATION OF THE WITNESS TAKEN BEFORE:
DENISE NARDULLI, RMR, CRI, CPE, COURT REPORTER

cover-up?

Was there -- was there an answer?

A.    I'm thinking, ma'am.  I need a moment.

Q.    Oh, absolutely.

A.    Can you say the question again, ma'am?

Q.    Yes.  Did you get other officers to participate in the Ronnie Price cover-up?

A.    I don't -- I may have to invoke my fifth amendment right and decline to answer.  I don't want to speculate, either.  I don't remember.

Q.    Okay.  Well, I just want to ask, specifically, about you and what you did.  Did you rely upon the "Code of Silence" to file the false report in the Ronnie Price incident?

MR. GILLE:  Objection.  Vague and ambiguous as to the term "Code of Silence," calls for speculation, lacks foundation, incomplete hypothetical, asked and answered, argumentative.  Go ahead.

THE DEPONENT:  I don't know if it was a "Code of Silence," but I just filed a false report.

Force" and nothing happened to them; true?

MR. GILLE:  Same objection.

THE DEPONENT:  I don't want to state their punishments, ma'am, for reprimanding.

BY MS. DELLA DONNA:

Q.    And you were not disciplined prior to the Ronnie Price incident; true?

MR. GILLE:  Objection.  Vague and ambiguous.

THE DEPONENT:  No.

BY MS. DELLA DONNA:

Q.    Did you believe that Sacramento prison had a pattern of not holding officers accountable for misconduct?

A.    Everybody is held accountable for their actions, ma'am.

Q.    I'm sorry.  I didn't -- I didn't hear you.

A.    Everyone is held accountable for what they do, ma'am.  I can't speak to the other officers.

Q.    So on the date of the incident, you were assigned to escort Ronnie Price; true?

A.    Yes.  It's on record, ma'am.

MR. GILLE: Objection. Calls for speculation, lacks foundation, vague and ambiguous.

THE DEPONENT: I don't want to speculate on why Luna didn't want to submit a report.

BY MS. DELLA DONNA:

Q. Was part of the reason why you told Luna not to submit a report, is that because of the "Code of Silence"?

MR. GILLE: Objection. Misstates testimony, vague and ambiguous.

THE DEPONENT: No, ma'am. It's --

BY MS. DELLA DONNA:

Q. You did not tell him not to submit a report because of the "Code of Silence"?

A. No. He just said he didn't want to --

MR. GILLE: Objection. Vague and ambiguous.

BY MS. DELLA DONNA:

Q. You can answer.

A. I did, ma'am. I said, he didn't want to write.

A.    Yes.  It's on record.

Q.    Okay.  And I'm just trying to confirm that the reason that your report, you had inaccuracies made in your report was because you were concerned about potential adverse impact and discipline, if the true reason was in the report; is that accurate?

A.    It's on record, yes, sir.

MR. GILLE:  Okay.  Thank you. That's all I have.

MS. DELLA DONNA:  Okay.  I just have a couple more questions.

EXAMINATION

BY MS. DELLA DONNA:

Q.    Did you have any training with regard to escorting prisoners from one cell to the other?

A.    Uh, no.  I don't believe so, ma'am.

Q.    And did ever -- were you ever trained that you could not use force to take an inmate to the ground if they were resisting?

MR. GILLE:  Objection. Incomplete hypothetical.  You can answer.

THE DEPONENT:  Can you rephrase the question, ma'am?

# EXHIBIT H



# Transcript of **JoAnn Price**

Wednesday, June 25, 2025

*JoAnn Price et al. v. Arturo Pacheco, et al.*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 156438

BY MR. GILLE

Q.   You can answer.

MS. DELLA DONNA:  Do you understand his question?

THE WITNESS:  Unh-unh.

MS. DELLA DONNA:  Me neither.

BY MR. GILLE

Q.   Did you ever express a disbelief that your brother was involved in a fight with another inmate?

MS. DELLA DONNA:  Same objection. Vague and ambiguous.  Calls for speculation.

Do you understand the question?

THE WITNESS:  I do not know.

BY MR. GILLE

Q.   Did you ever talk to anybody about the cause of your brother's death?

MS. DELLA DONNA:  Other than your attorneys.

THE WITNESS:  They was not answering our questions, but they would call me from the jail.

BY MR. GILLE

Q.   Did you ever talk to be Mr. Dapremont about your brother's death and what caused it?

A.   I can't do nothing but speculate.

Q.   What did you speculate about?



A. What happened to him about them killing him.

Q. Who is them?

A. The people in the jail.

Q. Are you talking about inmates or guards or both?

A. The guards.

Q. When did you first believe that guards may have been involved?

A. It was hard to believe at first, but once you thought about it and seen the evidence, there was nothing you could do but believe.

Q. When did you first have that belief?

A. When they called me on the phone.

Q. Who is they?

A. The guards. He was nonchalant. Very. I wasn't sure. I didn't know they had killed Ronny.

Q. But you thought it was possible?

A. Not really.

Q. But you believe or you understand now that the correctional officers were involved in his death; is that correct?

A. They were nonchalant. That's how they would talk to me. I figured something was wrong, but I couldn't put my finger on it.

Case 2:22-cv-01610-DAD-DMC    Document 196-4    Filed 07/06/26    Page 89 of 131

Q.    And that is when you were first notified about your brother's death?

A.    Right.

Q.    Were you ever contacted by the United States attorney about your brother's death?

A.    No, I was not.

Q.    Were you ever contacted by the Sacramento corner's office about your brother's death?

A.    No, I was not.

Q.    Were you involved at all about the disposition of your brother's property after he passed away?

A.    No one mentioned it to me.

Q.    Do you understand who if anybody was handling your brother's remains after he passed away?

A.    I figured that they were going to cremate my brother.

Q.    Did you ask anybody about that?

A.    No, I didn't.

Q.    You never tried to contact CDCR about how to handle the remains?

A.    No.

Q.    Do you know if anybody from your family did?

TP.One
Court Reporting                 Scheduling@TP.One           800.FOR.DEPO
                                www.TP.One                  (800.367.3376)

Case 2:22-cv-01610-DAD-DMC    Document 196-4    Filed 07/06/26    Page 90 of 131

A.    No.

Q.    Did you ever talk to anybody in the news about your brother's death?

A.    No, I didn't.

Q.    Have you ever been contacted by any news agency about your brother's death?

A.    No, I haven't.

Q.    Did Mr. Dapremont ever express concern to you that he thought the guards may be involved in your brother's death?

A.    That's a fact.  We all thought that.

Q.    And you thought that with your brother?

A.    Well, it did happen.

Q.    Right.

A.    So --

Q.    And when did you discuss that possibility with your brother?

A.    It was after Ronny had died.

Q.    Do you know about how long after he died? Soon after he died?  Within months or years?

A.    At least months.

Q.    Have you ever had contact with any of the officers who were involved in the incident?

A.    No.

Q.    Aside from your discussions with the law

A.    I don't remember.

Q.    But you were there when he read it to the court; correct?

A.    Right.

Q.    And you said you spoke with a friend about this case.  What was her name again?  Last name was Green?

A.    Dianne.

Q.    What did you and her talk about related to your brother's death?

MS. DELLA DONNA:  Objection.  Asked and answered.

BY MR. GILLE

Q.    Go ahead.

A.    What does that mean?

MS. DELLA DONNA:  It means you can answer it again, but he's already asked it, but you can answer it again.  Go ahead and answer.

THE WITNESS:  What was the question?

BY MR. GILLE

Q.    What did you and Dianne talk about related to your brother's death?

A.    They killed Ronny.

Q.    When did you have that conversation with her?

 TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

A.    That's when it first happened.

Q.    Who is they?    You said they killed.

A.    The police.

Q.    When the police killed Ronny?

A.    Yes.

Q.    There was some testimony that you have been diagnosed or --

Strike that.

We will leave that out for right now.  But we will get a quick stipulation on the record that we talked off the record about Mrs. Price's medical condition as it relates to depression, medical anxiety and other issues, and she's not making a claim for now, but if she does, you will provide all of the documentation and provide her for a second deposition without objection.

MS. DELLA DONNA:  Correct.

MR. GILLE:  We can take a five minute break now, and I think we are almost done.

MS. DELLA DONNA:  Sure.

THE VIDEOGRAPHER:  The time is 12:39 P.M.  We are off the record.

(Recess.)



# EXHIBIT I



# Transcript of **Takis Tucker**

Wednesday, June 25, 2025

*JoAnn Price et al. v. Arturo Pacheco, et al.*

www.TP.One
800.FOR.DEPO (800.367.3376)
Scheduling@TP.One

Reference Number: 156356

Q.    Did he give you a phone number to call?

A.    Yes.

Q.    Did you ever call that number?

A.    Yes.

Q.    Did you talk to anybody on the line?

A.    No.

Q.    Did you ever talk to anybody else from CDCR after the conversation with Sergeant Steele?

A.    No.

Q.    And when I'm referring to CDCR, I'm talking about anybody from the prison at all whether it be a warden, some other correctional officer or anybody who works for the State of California?

A.    No.

Q.    Do you recall the phone number that Sergeant Steele provided to you?

A.    I just remember it started with (916) area code.

Q.    And how many times did you try calling that number?

A.    I think about 20 to 30 times.

Q.    Did you ever look for another number to call?

A.    I didn't, no.

Q.    Did you ever look to see if CDCR had

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

another number available on their website?

A.    No.

Q.    Why not?

MS. DELLA DONNA:   If you know, why not?

THE WITNESS:   Because I trusted Sergeant Steele.  I trusted him.  I trusted the peace officers to give me the right information he gave me.

BY MR. GILLE

Q.    And after you weren't receiving any responses from that phone number, did you try to look up any other phone number?

A.    No.

Q.    And even though you trusted the officer, and you weren't able to get through to anybody from CDCR, you still didn't attempt to look for another number to call; is that correct?

A.    Correct.

Q.    Did you ever see any paperwork or mail or any documents related to your uncle's death?

A.    No.

Q.    Do you know what happened to his property from the prison?

A.    No.

**TP.One**
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

A.   I was told that they all lost their jobs.

Q.   Did you ever try to communicate with Warden Boughman or Lynch at any time after your uncle passed away?

A.   No.

Q.   Why not?

MS. DELLA DONNA:  If you know.

Calls for speculation.

THE WITNESS:  I don't know.  I was confused.

BY MR. GILLE

Q.   When you didn't receive a response from the phone calls you made to the number provided by Sergeant Stelle, did you try to do any other investigation into the incident?

A.   No.

Q.   Do you know if anybody did?

A.   No.

Q.   Do you know what happened to your uncle's remains?

A.   He was cremated.

Q.   Do you know was anybody from your family contacted regarding the disposal of the remains?

A.   Yes, David Johnson.

Q.   Do you know if David Johnson received all

happened about the incident?

A.    No.  I gave him the rundown about a month and a half ago with my Uncle Def, and prior to that that was maybe about a couple months prior telling Deffy exactly what happened from the beginning to end as far as Ronny giving a statement and everything like that.  And nobody knew about that.

Q.    Is Uncle Def Beverly?

A.    Yes.

Q.    Did you ever do your own research about this case or about any -- about anything about the prison or the guards or the wardens prior to being contacted by Kresta Daly?

A.    No, no.

MR. GILLE:  All right.  Those are all of the questions I have for you today.

MS. DELLA DONNA:  I just have a couple of things to clear up if that's okay.


EXAMINATION

BY MS. DELLA DONNA

Q.    I want to state for the record that I'm Annee Della Donna, and I'm your attorney and your mother's attorney.

You mentioned that Ronny was like a father

TP.One
Court Reporting

Scheduling@TP.One
www.TP.One

800.FOR.DEPO
(800.367.3376)

# EXHIBIT J

V. James DeSimone (SBN: 119668)[1]
**Vjdesimone@gmail.com**
Carmen D. Sabater (SBN: 303546)
**Cds820@gmail.com**
Ryann E. Hall (SBN: 306080) Of-Counsel
**rhall@bohmlaw.com**
**VJD000156@bohmlaw.com**
**V. JAMES DESIMONE LAW**
13160 Mindanao Way, Suite 280
Marina del Rey, California 90292
Telephone:  310.693.5561
Facsimile:   323.544.6880

Facsimile: (916) 440-9610

Attorneys for Plaintiffs, JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest,<br><br>    PLAINTIFFS,<br><br>    v.<br><br>ARTURO PACHECO, ASHLEY MARIE AURICH, JEFFREY BIGNEY, ARTURO LUNA, BRENDA VILLA, DAVID BAUGHMAN, JEFFREY LYNCH and DOES 1 through 15, inclusive, in their official and personal/individual capacities.<br><br>    DEFENDANTS. | Case No: 2:22-cv-1610 DAD-DMC (PC)<br>Assigned to Hon. Dennis M. Cota<br><br>**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**<br><br><br>Action Filed: September 14, 2022<br>Trial Date:    October 6, 2026 |

///

///

///

---

[1]Attorneys of record continued on page 2

1

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                           V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                                        Dubin Law Firm

Anne Della Donna (SBN:138420)
annee@delladonnalaw.com
**LAW OFFICE OF ANNEE DELLA DONNA**
301 Forest Ave
Laguna Beach, California 92651
Telephone: 949.376.5730
Facsimile: 949.497.5627

Eric Dubin (SBN: 160563)
edubin@dubinlaw.com
**DUBIN LAW FIRM**
19200 Von Karman Ave 6th Floor
Irvine, California 92612
Telephone:  949.477.8040

///

///

///

2

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

*Price, et al. v. Arturo Pacheco, et al.*                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)          Law Office of Annee Della Donna
                                                                          Dubin Law Firm

**PROPOUNDING PARTY:**      **Defendant, D. BAUGHMAN**

**RESPONDING PARTY:**      **Plaintiff, JOANN PRICE**

**SET NUMBER:**      **ONE (1)**

COMES NOW Plaintiff **JOANN PRICE**, by and through his counsel of record, and hereby responds to Defendant **D. BAUGHMAN** First Set of Interrogatories pursuant to the provision of Rule 33 of the Federal Rules of Civil Procedure.

## GENERAL OBJECTIONS

To avoid undue repetition, Plaintiff makes the following general objections to Defendant's Interrogatories, Set One to Plaintiff. To the extent applicable, each general objection is part of the specific objection to each Interrogatory whether or not specifically incorporated. The statement of any general or specific objection herein does not act as a waiver of any other general or specific objection.

Without prejudice to the foregoing General Objections, Plaintiff, **JOANN PRICE** as follows:

1.      Plaintiff's investigation and discovery in this matter are continuing and may reveal additional information that may be responsive to the Defendant's Interrogatories. Plaintiff's further investigation and discovery also may reveal that the facts on which he bases her responses to the Defendant's Interrogatories are imperfectly understood. Plaintiff responds to Defendant's Interrogatories based upon the information and documents presently known and available to her and reserves the right to supplement or modify her responses based upon subsequently discovered or acquired information and/or documents. Plaintiff expressly reserves the right to rely on, at any time, including, but not limited to, trial, subsequently discovered information and/or documents or other information or evidence omitted from Defendant's Interrogatories as a result of error, oversight, or inadvertence.

2.      Plaintiff bases these objections and responses on the assumption that Defendant, in propounding these Interrogatories, did not intend to seek information protected against discovery by the attorney-client privilege, the attorney work-product

3

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES,
SET ONE
*Price, et al. v. Arturo Pacheco, et al.*                                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                    Law Office of Annee Della Donna
                                                                                                            Dubin Law Firm

doctrine, or documents that contain or reflect impressions, conclusions, opinion, legal research, or theories of Plaintiff's attorneys or his agents.  To the extent that Defendant's Interrogatories, or any part thereof, are intended to elicit such information, Plaintiff objects thereto and asserts the privileges provided in and by the foregoing doctrines to the fullest extent permitted by law.

3.    Plaintiff objects to these Interrogatories to the extent that they seek information or documents protected from disclosure by the right to privacy provided by the California Constitution, Art. 1, § 1, the good cause requirements of Code of Civil Procedure § 2031, the Ninth Amendment to the United States Constitution, or any other applicable privilege.

4.    Plaintiff objects to each of Defendant's Interrogatories to the extent it is vague, ambiguous, and uncertain.  Notwithstanding this objection, Plaintiff reserves the right to amend or supplement its responses should the Court or Defendant later assert a different interpretation.

5.    Plaintiff objects to these Interrogatories to the extent that they ask for information that is irrelevant to the subject matter of this action and not reasonably calculated to lead to the discovery of admissible evidence.

6.    Plaintiff objects to these Interrogatories to the extent they seek information equally available to and/or already in the possession of Defendant.

7.    Plaintiff's responses and objections are made without, in any matter, waiving: (a) the right to assert any other applicable objection to the Interrogatories; (b) the right to object to the use of any answer for any purpose, in this action or in any other action, on the grounds of privilege, relevancy, materiality, or any other appropriate grounds; (c) the right to object to any further request for relating to the subject matter of the answers herein; and (d) the right to revise, correct, or clarify any of these responses at any time.

///

///

4

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                                                   V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                                      Law Office of Annee Della Donna
                                                                                                                                    Dubin Law Firm

## SPECIAL INTERROGATORIES AND RESPONSES

**SPECIAL INTERROGATORY NO. 1:**

If YOU had any COMMUNICATIONS with D. BAUGHMAN concerning the INCIDENT, please DESCRIBE EACH COMMUNICATION with him.

**RESPONSE TO SPECIAL INTERROGATORY NO. 1:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Plaintiff does not recall having any communication with D. BAUGHMAN concerning the incident. Plaintiff's counsel sent a Government Tort Claim to the California Department of Corrections on or around August 12, 2022.

**SPECIAL INTERROGATORY NO. 2:**

Please state all facts describing how D. BAUGHMAN was involved in the INCIDENT that forms the basis of YOUR COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 2:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows upon information and belief:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's

5

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES,
SET ONE
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written,

6

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such

7

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                       Dubin Law Firm

personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 3:**

If YOU claim that D. BAUGHMAN failed to protect DECEDENT, please describe the actions that D. BAUGHMAN took, or failed to take, that constitute YOUR failure to protect claim against him.

**RESPONSE TO SPECIAL INTERROGATORY NO. 3:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows upon information and belief:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

8

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE

*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written, didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is

9

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                      Dubin Law Firm

evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 4:**

If YOU claim that D. BAUGHMAN was deliberately indifferent to DECEDENT'S medical needs and/or safety, please describe the actions that D. BAUGHMAN took, or failed to take, that constitute YOUR deliberate indifference claim against him.

**RESPONSE TO SPECIAL INTERROGATORY NO. 4:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows upon information and

10

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE

*Price, et al. v. Arturo Pacheco, et al.*                                           V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                              Law Office of Annee Della Donna
                                                                                              Dubin Law Firm

belief:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports

11

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE

*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written, didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

12

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)
V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 5:**

If YOU contend that D. BAUGHMAN knew of and disregarded the existence of a substantial or excessive risk to DECEDENT'S health and/or safety, please state all facts to support this contention.

**RESPONSE TO SPECIAL INTERROGATORY NO. 5:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows upon information and belief:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our

13

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

*Price, et al. v. Arturo Pacheco, et al.*                                   V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                         Law Office of Annee Della Donna
                                                                                          Dubin Law Firm

duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written, didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer

14

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)              Law Office of Annee Della Donna
                                                                    Dubin Law Firm

that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 6:**

15

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

If YOU contend that D. BAUGHMAN was the cause or proximate cause of DECEDENT'S injuries and death, please state all facts to support this contention.

**RESPONSE TO SPECIAL INTERROGATORY NO. 6:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows upon information and belief:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting

16

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE

*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                     Dubin Law Firm

inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written, didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have

17

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 7:**

Please describe approximately how frequently you COMMUNICATED with DECEDENT in the last year of his life, and the manner of that COMMUNICATION (e.g., mail letters, telephone calls, in-person visits, etc.).

**RESPONSE TO SPECIAL INTERROGATORY NO. 7:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Every week and half to two weeks. Mr. Price used another inmate's cell phone to contact his family.

///

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

**SPECIAL INTERROGATORY NO. 8:**

Please identify each person, excluding your attorneys, that YOU have had COMMUNICATIONS with, written or oral, about the INCIDENT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 8:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Sukey Lewis from KQED Radio

Takis Tuker

**SPECIAL INTERROGATORY NO. 9:**

If YOU had any COMMUNICATIONS with anyone from the California Department of Corrections and Rehabilitations (CDCR) about the INCIDENT, please Identify each person and DESCRIBE EACH COMMUNICATION YOU had with her or him.

**RESPONSE TO SPECIAL INTERROGATORY NO. 9:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Around September 24, 2016, Sergeant Kevin Steele, member of the Investigative Services Unit ("ISU") since 2015, called JoAnne Price's cellphone and informed her that Ronnie Price had passed away. He identified himself as a member of the Investigative Services Unit and informed Ms. Price that Mr. Price was hit in the jaw by a cellmate. Sergeant Steele did not give Ms. Price the name of the cellmate. However, Sergeant Steele gave Ms. Price 916 numbers to call for more information. Sergeant Stelle also inquired about how Ms. Price wanted to handle Ronnie Price's remains. Not knowing Defendants were responsible for Mr. Price's death, Ms. Price elected to have Mr. Price cremated.

Ms. Price and her family were concerned about whether the cellmate would receive an

19

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

*Price, et al. v. Arturo Pacheco, et al.*                                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                  Law Office of Annee Della Donna
                                                                                                            Dubin Law Firm

extended sentence for Mr. Price's death. Accordingly, Ms. Price and her family called the 916 numbers about 20-30 times, every day for about one month. Every time Ms. Price or her family called, the number would ring and ring with no answer or option to leave a voicemail. Nobody ever answered the 916 number the family was provided.

Plaintiff's counsel sent a Government Tort Claim to the California Department of Corrections on or around August 12, 2022.

**SPECIAL INTERROGATORY NO. 10:**

Please IDENTIFY EACH PERSON who has information, along with facts that the PERSON has knowledge of, that supports any of YOUR causes of action against D. BAUGHMAN as alleged in YOUR COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 10:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

JoAnn Price

Takis Tucker

Arturo Pacheco. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Ashley Aurich. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Jeffery Bigney. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Arturo Luna. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Brenda Villa. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Dorion Lopez. This witness is expected to have knowledge of the circumstances

20

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                      Law Office of Annee Della Donna
                                                                                  Dubin Law Firm

surrounding the death of Mr. Price and the subsequent cover up.

David Baughman. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up, and the training and policies at CSP Sacramento.

Jeffery Lynch. This witness is expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up, and the training and policies at CSP Sacramento.

Medical personnel at University of California Davis Medical Center. These witnesses are expected to have knowledge of the extent of Price's injuries and cause of death.

Internal Affairs Investigators. These witnesses are expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

Federal Bureau of Investigation Agents. These witnesses are expected to have knowledge of the circumstances surrounding the death of Mr. Price and the subsequent cover up.

**SPECIAL INTERROGATORY NO. 11:**

Please IDENTIFY each and every fact which supports YOUR cause of action for "Concealment" against D. BAUGHMAN.

**RESPONSE TO SPECIAL INTERROGATORY NO. 11:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's

21

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                        V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                          Dubin Law Firm

Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written,

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                         Law Office of Annee Della Donna
                                                                                    Dubin Law Firm

didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such

23

PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE
*Price, et al. v. Arturo Pacheco, et al.*
Case No.: 2:22-cv-1610 DAD-DMC (PC)

V. James DeSimone Law
Law Office of Annee Della Donna
Dubin Law Firm

personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 12:**

Please state all facts that support YOUR claim that D. BAUGHMAN acted with malice, oppression or reckless disregard for DECEDENT'S rights, to support YOUR claim for punitive damages, as alleged in YOUR COMPLAINT.

**RESPONSE TO SPECIAL INTERROGATORY NO. 12:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

D. Baughman was acting warden in 2016. Defendants Baughman and Lynch had a duty under California law to establish operational plans and procedures for implementation of prison regulations and the law allows for supervisors to be liable for implementing a policy that itself repudiates a constitutional right. Defendants Baughman and Lynch were on notice of and deliberately indifferent to the "culture of corruption" and "code of silence" which contributed to Mr. Price's death.

The Code of Silence is in direct contradiction to the CDCR's Code of Ethics "CDCR's Department Operations Manual, 33030.3.3 Law Enforcement Code of Ethics provides, in pertinent part: "As employees and appointees of the Department, we are expected to perform our duties, at all times, as follows: Demonstrate professionalism, honesty, and integrity; Accept responsibility for our actions and their consequences; Appreciate differences in people, their ideas, and opinions; Treat fellow employees, inmates, wards, parolees, victims, their families, and the public with dignity and respect; Respect the rights of others and treat them fairly regardless of race, color, national origin, ancestry, gender, religion, marital status, age, disability, medical condition, pregnancy, sexual orientation, veteran status, or political affiliation; Comply with all applicable laws and regulations…" Baughman and Lynch were responsible for ensuring that officers were trained and complied with the Code of Ethics.

Baughman and Lynch were aware of the "culture of corruption resulting in the use of

24

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                      Law Office of Annee Della Donna
                                                                                                          Dubin Law Firm

excessive force against inmates" prior to Price's death but failed to issue any discipline or corrective action. Baughman and Lynch were aware guards (including Pacheco) were assaulting inmates prior to Price's death yet did not stop the behavior. Baughman and Lynch were aware that their subordinates followed a "code of silence," which they reasonably should have known would cause his subordinates to freely inflict constitutional injuries knowing they would be "protected" yet failed to implement any training or enforcement to remedy the issue.

Just four months prior to Pacheco's assault on Price, Pacheco pepper-sprayed a 54-year-old prisoner in his cell, falsely claiming later that the prisoner had a piece of glass and refused to drop it. Baughman and Lynch knew or should have known that Pacheco was falsifying the reports to cover up excessive force. Since Pacheco was not disciplined for this conduct, it can be reasonably inferred that procedure to investigate the use of force was also inadequate in Pacheco's prior incident. The Code of Silence and known failure to investigate uses of force emboldened Pacheco, so he too was impervious to the consequences of his misconduct, and his text messages confirming the code of silence evidence his bold confidence that his brutal assault, witnessed by several of his co-correctional officers, would be ignored and unpunished.

The day after the incident, Ronnie Price gave a statement on what really happened at time before the attack. Neither Baughman nor Lynch made sure that an accurate report was written, didn't initiate an internal investigation amongst their subordinates, nor did they advise sergeant Kevin Steel of the Special Investigative Unit (SIU) to tell the family that a correctional officer that works in his institution injured Mr. Price by unprovoked use of force, who later succumbed to those injuries.

Despite the fact that the prison had a videorecorded interview of Mr. Price in its possession outlining the brutal and unlawful force utilized against him, as required under the CCR, Baughman and Lynch clearly had an existing policy to abide by the Code of Silence and not adequately investigate uses of force and staff misconduct because they did nothing. The complete failure to properly investigate this incident by multiple levels of review—despite a videorecorded interview in the prison's possession where a deceased inmate accounts what happened to him--is evidence that there was a policy of failing to investigate uses of force, which further emboldened

25

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                    V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                      Dubin Law Firm

officers to commit constitutional violations.

If the investigation did occur as required by the CDCR, Baughman and Lynch would have known about the recording. Pursuant to the CCR, the Warden is involved in reviewing uses of force. See 15 CCR Section 3268.1. The fact that Pacheco was not disciplined until 2018 creates a reasonable inference that Baughman and/or Lynch ratified his conduct.

In November 2016, inmate Milton Beverly, Jr. died while at CSP-Sac. and one officer was prepared to testify as to a "code of silence" cover-up, the officer reported the facts to Defendants Baughman and Lynch, and that Defendants failed to act. Baughman and Lynch continued to ignore the rampant corruption.

Upon information and belief, in 2017 Baughman and Lynch became aware that Pacheco, Aurich, Lopez, and Luna, had been communicating about the Code of Silence. However, the involved officers were not terminated until June 25, 2018. Neither Baughman nor Lynch informed the Price family about the true regarding Mr. Price's death.

Upon information and belief, Baughman and Lynch were aware of the constitutional violations occurring at their prison and failed to act on them. Supervisory personnel who act by implementing a policy so deficient that the policy itself is a repudiation of constitutional rights and the moving force behind a constitutional violation may also be liable even where such personnel do not overtly participate in the offensive act.

**SPECIAL INTERROGATORY NO. 13:**

On approximately what date did you first suspect that CDCR, or any of its employees, wrongfully caused or contributed to DECEDENT'S death?

**RESPONSE TO SPECIAL INTERROGATORY NO. 13:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

On or around July 22, 2022.

///

26

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

*Price, et al. v. Arturo Pacheco, et al.*                                                V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                   Law Office of Annee Della Donna
                                                                                                         Dubin Law Firm

**SPECIAL INTERROGATORY NO. 14:**

When was the first time you communicated with CDCR, or any of its employees, regarding DECEDENT'S death?

**RESPONSE TO SPECIAL INTERROGATORY NO. 14:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

On or around September 24, 2016.

**SPECIAL INTERROGATORY NO. 15:**

Please identify the name, approximate age, and contact information for each of DECEDENT'S children?

**RESPONSE TO SPECIAL INTERROGATORY NO. 15:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

None.

**SPECIAL INTERROGATORY NO. 16:**

Please identify any phone number and carrier (e.g. AT&T, Verizon, etc…) on which CDCR called YOU about any matter related to the DECEDENT'S death.

**RESPONSE TO SPECIAL INTERROGATORY NO. 16:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

To Plaintiff's best recollection the cellphone was on Verizon wireless. Plaintiff cannot recall the phone number.

27

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                              V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                                    Law Office of Annee Della Donna
                                                                                                        Dubin Law Firm

**SPECIAL INTERROGATORY NO. 17:**

Excluding CDCR, please identify the name, date, contact information of any federal or state agency or organization that contacted YOU or any member of YOUR family regarding the DECEDENT'S death.

**RESPONSE TO SPECIAL INTERROGATORY NO. 17:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Attorneys Kresta Daly and Mark Redmond contacted Plaintiff on or around July 22, 2022. Kresta Daly contact information is 2810 5th ST, Davis, CA 95618, Ph#916 440 8600, email: kdaly@barth-daly.com. Mark Redmond contact information is 656 Fifth Ave San Diego, CA 92101 Ph#877529-6305, email: mr@markredmondlaw.com

**SPECIAL INTERROGATORY NO. 18:**

State the amount of each type of damages YOU seek from D. BAUGHMAN, specify how YOU calculated the amounts of damages sought, and identify each document that supports or shows YOUR calculation of the amount of damages sought from D. BAUGHMAN.

**RESPONSE TO SPECIAL INTERROGATORY NO. 18:**

Responding Party objects that this Request is compound, vague, overbroad, and ambiguous. Responding Party further objects that this Request seeks information which is protected from disclosure by the attorney-client privilege.

Without waiving said objections, Plaintiff responds as follows:

Plaintiff will seek hedonic damages for decedent's loss of life and loss of the pleasure of living under 42 USC 1983, Price's pain and suffering under all survivor causes of action, wrongful death damages, and personal damages for the harm stemming from the concealment and intentional misrepresentation.

The amount of non-economic damages will be determined by a jury. Plaintiff's noneconomic damages are a question of fact to be determined by a jury, thus, Plaintiff has no

28

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**
*Price, et al. v. Arturo Pacheco, et al.*                                        V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                          Law Office of Annee Della Donna
                                                                                              Dubin Law Firm

discovery obligation to provide a calculation.  See, e.g., Jackson v. United Artists Theatre Circuit, Inc., 278 F.R.D. 586, 593 n.1 (D. Nev. 2011) (emotional distress damages are subjective and do not lend themselves to computation); E.E.O.C. v. Wal-Mart Stores, Inc., 276 F.R.D. 637, 639 (E.D. Wash. 2011) ("district courts have frequently denied motions to compel computations of emotional distress . . . because they are "difficult to quantify" and are "typically considered a fact issue for the jury") (citing Anderson v. United Parcel Service, 2010 WL 4822564, *10, note (D.Kan. Nov. 22, 2010) (collecting cases)); see also Mintz v. Bartelstein, No. 2:12-CV-02554-SVW-SS, 2012 WL 12865276, at *2 (C.D. Cal. Nov. 15, 2012) ("emotional distress damages . . . because of their vague and fact specific nature, are not amenable to calculation").

Date: April; 11, 2025

**V. JAMES DESIMONE LAW**

By: _____

    V. JAMES DESIMONE, ESQ.
    RYANN E. HALL, ESQ.
    Attorneys for Plaintiffs JOANN PRICE, successor in interest to Ronnie Price, deceased; and the ESTATE OF RONNIE PRICE; and his successors in interest

29

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

*Price, et al. v. Arturo Pacheco, et al.*                                             V. James DeSimone Law
Case No.: 2:22-cv-1610 DAD-DMC (PC)                              Law Office of Annee Della Donna
                                                      Dubin Law Firm

**<u>VERIFICATION</u>**

I, **JOANN PRICE**, the undersigned certify and declare that I am the Plaintiff in this action; I have read the foregoing:

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT**

**D. BAUGHMAN'S INTERROGATORIES, SET ONE**

and I know the contents thereof are true based upon my own personal knowledge.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

This Verification was executed on this ___April 11, 2025___, in ___Reseda___, California.

*JoAnn Price*
_____
**JOANN PRICE**

**VERIFICATION**

*Price, et al. v. Pacheco, et al.*
United States District Court, Central District of California
Case No.: 2:22-cv-01610-DAD-DMC

## PROOF OF SERVICE ELECTRONIC MAIL

I, the undersigned declare that I am employed in the County of Los Angeles, State of California. I am over the age of eighteen (18) years and not a party to the within action; my business address is: 13160 Mindanao Way, Suite 280, Marina del Rey, California 90292.

On April 11, 2025, I served the within:

**PLAINTIFF JOANN PRICE RESPONSES TO DEFENDANT D. BAUGHMAN'S INTERROGATORIES, SET ONE**

XX      By placing a true copy thereof enclosed in a sealed envelope with prepaid postage thereon fully prepaid for deposit in the United States Post Office mail box, at my business address shown above, following the V. James DeSimone Law's ordinary business practices for the collection and processing of correspondence for mailing, of which I am readily familiar, to the individual(s) and address(s) as set forth below.

XX      By sending a true copy thereof electronically to the individual(s) and electronic service address(es) as set forth below from the electronic service address: **kmedina@bohmlaw.com**.

### SEE ATTACHED SERVICE LIST

I declare under the penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on April 11, 2025, in Marina del Rey, California.

Kimberly Medina
Paralegal Supervisor

1

**PROOF OF SERVICE**

*Price, et al. v. Pacheco, et al.*
United States District Court, Central District of California
Case No.: 2:22-cv-01610-DAD-DMC

<u>**SERVICE LIST**</u>

| | |
|---|---|
| **Rob Bonta, Esq.** | **Attorneys for Defendants,** |
| **Attorney General of California** | **D. Baughman and J. Lynch** |
| **Jay M. Goldman, Esq.** | |
| **Supervising Deputy Attorney General** | |
| **Ryan T. Gille, Esq.** | |
| **Deputy Attorney General** | |
| **Ryan.Gille@doj.ca.gov** | |
| **Marlene.Paredes@doj.ca.gov** | |
| 455 Golden Gate Avenue, Suite 11000 | |
| San Francisco, CA  94102-7004 | |
| | |
| **Arturo Pacheco** | **Attorneys for Defendant,** |
| P.O. Box 27811 | **Arturo Pacheco, Pro Per** |
| Sacramento, CA 95827 | |

2

**PROOF OF SERVICE**